# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

|  |  |  |
|---|---|---|
| CARLA WIGGINS, AS | ) | |
| PERSONAL REPRESENTATIVE | ) | |
| OF THE ESTATE OF CARLTON | ) | |
| D. GAUTNEY, JR., | ) | Case No.: 3:22-cv-02781-MCR-ZCB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDTRONIC MINIMED, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT MEDTRONIC MINIMED, INC.'S MOTION TO EXCLUDE THE EXPERT REPORT/OPINION OF PETER GOULDEN, M.D., WITH INCORPORATED MEMORANDUM OF LAW

Defendant Medtronic MiniMed, Inc. ("Medtronic"), pursuant to Federal Rule of Evidence 702 and 703, respectfully moves this Court for an order excluding the expert report and opinion of Peter Goulden, M.D. (the "Motion"). Medtronic submits the following Memorandum of Law in Support of its Motion and states as follows:

### STATEMENT REGARDING ORAL ARGUMENT

Medtronic respectfully requests oral argument of approximately thirty minutes on this Motion due to the issues involved. Medtronic believes the Court will benefit from a face-to-face presentation which would allow for real-time clarification, if requested.

# I.    INTRODUCTION

Sudden death is, unfortunately, a relatively common occurrence for people with Type 1 Diabetes ("T1DM")—much more so than it is in the general population.[1] Cardiovascular disease is the leading cause of death in older patients with longstanding T1DM, such as Decedent Carlton Gautney, Jr., and is a far more common cause of death than either hyperglycemia (high blood glucose) or hypoglycemia (low blood glucose).[2] Tragically, sudden cardiac death can be the first manifestation of cardiovascular disease.

Decedent Carlton Gautney, Jr. suffered from multiple medical conditions, including long-standing T1DM, hypertension, hyperlipidemia, obesity, and neuropathy. Mr. Gautney was found dead in his hotel room at age 59 at 10:56 a.m. on May 17, 2020. Plaintiff's endocrinology expert, Dr. Peter Goulden, does not (and cannot) know the exact time Mr. Gautney died, or if he was already deceased by 8:15 a.m. when he failed to interact with his MiniMed insulin pump alarm. (*See* Narotzky Decl. Ex. C, March 17, 2023, Deposition of Peter Goulden, M.D. ("Goulden Dep.") 229:10-16, 229:20-230:4.) Nevertheless, Dr. Goulden opines that

---

[1] *See* Ex. A to Declaration of Nicole Narotzky in Support of Medtronic's Motion to Exclude Peter Goulden, M.D. ("Narotzky Decl."), Secrest, et al, Ch. 35 "Mortality in Type 1 Diabetes" (2014) in Cowie, et al, *Diabetes in America*, 3rd ed., 2018. All Exhibits referenced are attached to the concurrently filed Narotzky Declaration unless otherwise noted.

[2] *See* Ex. A, Table 35.2; *see also* Ex. B, Norby, et al, *Sudden Cardiac Death in Patients with Type 1 versus Type 2 Diabetes*, Mayo Clinic Pro., 2022.

Mr. Gautney's death was due to "severe and prolonged" hypoglycemia, which, he posits, was caused by an insulin pump malfunction because he saw no evidence of any other cause of hypoglycemia. (Narotzky Decl. Ex. D, January 13, 2023, Rule 26 Report of Peter Goulden, M.D. (the "Report" or "Rep."), at 9-10; Narotzky Decl. Ex. C, Goulden Dep. 132:24-133:12.)

Dr. Goulden's opinion should be excluded for at least three reasons.

**First**, Dr. Goulden failed to reliably rule in insulin pump ("Device" or "pump") failure as a cause of Mr. Gautney's death, and in fact admits he is not qualified to offer any opinion on the function of Mr. Gautney's pump (*see e.g.,* Narotzky Decl. Ex. E, August 2, 2023, Deposition of Peter Goulden, M.D. ("Goulden Reb. Dep.") 87:12-18 (deferring to Plaintiff's technical expert Charles Clemens)).

**Second,** relying on only 19 pages of medical records (Narotzky Decl. Ex. C, Goulden Dep. 21:14-25), Dr. Goulden failed to reliably rule out (or even consider) other potential causes of Mr. Gautney's death. Although he attempts to dismiss other risk factors in a *post hoc* rebuttal, he still fails to reliably rule out any of those risk factors individually or taken in combination. His opinion is supported only by his *ipse dixit* and is thus unreliable.

**Third**, as a purported rebuttal opinion, Dr. Goulden cherry-picked and misinterpreted Medtronic data to illustrate his theory that Mr. Gautney experienced

a severe hypoglycemic episode. He lacks "good grounds" for his belated analysis, and it should be excluded.

Dr. Goulden's opinions fail under the Eleventh Circuit's "rigorous [] inquiry" into whether an expert's opinions are admissible. *Lee-Bolton v. Koppers Inc.*, 319 F. R. D. 346, 371 (N.D. Fla. 2017) (Rodgers, J.) (quoting *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F. 3d 1183, 1194 (11th Cir. 2010)). Accordingly, this Court should exclude the expert reports and testimony of Dr. Peter Goulden.

## II.    FACTUAL BACKGROUND

### A. Mr. Gautney's Medical History

At the time of his death, Mr. Gautney had a twenty (20) year history of Type 1 diabetes and had been on insulin pump therapy since 2012. (Narotzky Decl. Ex. F at Gautney Jr. 00031-34.) In addition to T1DM, Mr. Gautney had a significant past medical history including hypertension (high blood pressure), hyperlipidemia (high cholesterol), microalbuminuria (protein in urine), obesity, neuropathy, and lower extremity edema. (*See id.* at Gautney Jr. 00027-30, 00035-36, 00091-92, 00171, 00200-203.)

Mr. Gautney's medical history also demonstrates multiple risk factors, which both individually and when combined placed Mr. Gautney at increased risk of cardiovascular disease and cardiovascular death. These include at least the following: (1) being male, (2) over the age of 50, and suffering from (3)

hypertension, (4) hyperlipidemia, (5) obesity, and (6) T1DM. (Narotzky Decl. Ex. G, August 21, 2023, Deposition of Ehrin Armstrong, M.D. ("Armstrong Dep."), 100:21-101:4, 101:16-22, 99:17-100:7, 107:6-10, 130:12-18, 118:17-24.)

Heart disease is the leading cause of death for men in the United States and unfortunately, diabetes "is a major risk factor for atherosclerotic disease, as well as cardiovascular mortality and morbidity." (Narotzky Decl. Ex. G, Armstrong Dep. 72:13-20, 77:20-78:4.) In fact, "coronary artery disease remains the most frequent cause of death among patients with diabetes." (*Id*., at 80:23-81:4.) Moreover, "[a]lthough patients with [diabetes] have a higher prevalence of cardiovascular disease, the majority of patients are asymptomatic before presenting with myocardial infarction or other cardiovascular event." (*Id*., at 81:5-11.) Diabetes is a significant risk factor for cardiovascular disease and a cardiovascular event due in part to the fact that people with diabetes have higher glucose levels which "creates worsening inflammation, and therefore, injures the lining of the arteries" which in turn makes it more likely to develop plaque or other clotting. (*Id*., at 82:23-83:10.) Mr. Gautney's multiple risk factors for a cardiovascular event were not discussed anywhere in Dr. Goulden's initial report. (*See generally* Narotzky Decl. Ex. D, Goulden Rep.)

## B. Mr. Gautney's T1DM and Insulin Pump Usage

Beginning in 2012, instead of taking insulin injections, Mr. Gautney began using an insulin pump. At the end of July 2018, Mr. Gautney began using a Medtronic 670G insulin pump. He began using the specific 670G insulin pump at issue in approximately April 2019.

The 670G insulin pump is an external prescription medical device which delivers rapid-acting insulin through "continuous delivery of basal insulin […] and administration of insulin boluses […] for the management of Type 1 diabetes mellitus in persons […] requiring insulin." (Narotzky Decl. Ex. H, User Guide, at MDT_Guac0123469.) The 670G insulin pump was also the world's first self-adjusting insulin pump system for people with T1DM when used in AutoMode, along with an additional device called a Continuous Glucose Monitor ("CGM"). When in AutoMode, the MiniMed 670G Pump is intended to automatically calculate the basal insulin dose based on information received from the CGM. (*See id.* at MDT_Gauc123691.) In AutoMode the pump delivers basal insulin, and not bolus insulin, which the user still must calculate and program for delivery by the user. (*Id.*)

To deliver insulin, Medtronic insulin pumps use two other separate disposable devices: a reservoir and infusion set. The patient fills the disposable reservoir with insulin from a standard insulin vial. The reservoir of insulin is then connected to a separate device called an infusion set. The infusion set, like the reservoir of insulin,

should be discarded and changed every three days. The infusion set consists of a "P-cap" (also referred to as the tubing connector), tubing, needle, and canula, which is inserted under the skin to deliver insulin. The P-cap is the portion of the infusion set that attaches to the insulin reservoir. The reservoir is then placed into the pump, and the P-cap portion of the infusion set then screws into the reservoir compartment into an area on the pump known as the "retainer" or "retainer ring." Insulin is then delivered through the infusion set's tubing into the user's subcutaneous tissue. A depiction of the P-cap on the infusion set, reservoir, and the pump are below; the retainer ring is the portion of the pump into which the tubing connector is inserted:



Figure 39. MiniMed 670G Insulin Pump *User Guide*, p.128, on how to insert reservoir into the pump.

Regardless of whether someone with T1DM receives insulin using injections or an insulin pump, people with T1DM routinely suffer from both hyperglycemia (high blood glucose) and hypoglycemia (low blood glucose). Hypoglycemia occurs when an individual's blood glucose level drops below 70 mg/dL. As Dr. Goulden

explained, Level 1 hypoglycemia begins when blood glucose drops below 70, down to 54 mg/dL. (Narotzky Decl. Ex. C, Goulden Dep. 55:10-56:16.) Level 2 hypoglycemia is a BG below 54 mg/dL. (*Id.*) Level 3 or "severe" hypoglycemia is characterized by "altered mental and/or physical functioning" which requires assistance from others for recovery. (*Id.*, at 58:11-20.) The average individual with T1DM experiences about two episodes of symptomatic hypoglycemia per week. (*Id.,* at 82:13-83:6.) Hypoglycemia happens to all people with diabetes and can happen even when they are doing all they can to manage their disease. (*Id.*) Common causes of hypoglycemia include taking too much insulin, not consuming enough food, or consuming the wrong type of food, as well as increasing exercise or physical activity. (*Id.*, at 76:2-79:4.) Consequently, patients with T1DM are familiar with appropriate treatment for hypoglycemia and aware of its common occurrence. Over the years, Mr. Gautney experienced multiple Level 1, Level 2, and severe hypoglycemic events. (*Id.*, at 246:9-24.)

### a. Mr. Gautney's Death on May 17, 2020

At the time of his death, Mr. Gautney was 59 years old. He was traveling on his own in Destin, Florida and staying at a Motel 6. On May 16, 2020, the day before his death, Mr. Gautney rode his motorcycle from Opp, Alabama to Destin. When he arrived, he stopped to eat at a Hooters restaurant at around 12:22 p.m. (Narotzky

Decl. Ex. I, at PL-Gautney-Wiggins 00012.) Later that night, he ordered a small pepperoni pizza. (Narotzky Decl. Ex. J, at PL-Gautney-Wiggins 00935-936.)

Basal rates, bolus amounts, sensor glucose readings, and blood glucose readings from the time of Mr. Gautney's death were obtained from a download of his insulin pump. On the morning of May 17, 2020, at approximately 5:12 a.m., Mr. Gautney programmed into his pump that he ingested 24 grams of carbohydrates and programmed a 4-unit insulin bolus for delivery. (Narotzky Decl. Ex. K, at MDT_Gauc0122988.) Mr. Gautney's sensor glucose (or "SG") reading from his CGM around that time was 138. (*Id.*) Mr. Gautney's SG readings began to trend downwards, reading a 133 at 5:55 a.m., and ultimately reading a 62 at 7:00 a.m. (*Id.*)

At 7:03 and 7:27 a.m. Mr. Gautney's key card was used to enter his hotel room, and at 7:31 a.m. Mr. Gautney interacted with his insulin pump to clear a pump alarm. (Narotzky Decl. Ex. L at PL-Gautney-Wiggins 00196-219.) This is the last time Mr. Gautney was known to be alive. Housekeeping staff found Mr. Gautney deceased in his hotel room at 10:56 a.m. on May 17, 2020. (Narotzky Decl. Ex. F at Gautney Jr. 00174-176.)

Importantly, at 7:30 a.m., Mr. Gautney's sensor glucose was 75 mg/dL, but continued rising until 7:45 a.m., reaching 86 mg/dL. (*See* Narotzky Decl. Ex. M, Rule 26 Report of William Anderson, M.D., at 7.) Mr. Gautney's sensor glucose levels were therefore *not* in a hypoglycemic range (i.e., were *not* under 70 mg/dL)

from 7:30 a.m. until 8:05 a.m. His sensor glucose levels then began to decrease, dropping slightly below 70 (to 68) at 8:05 a.m. (Narotzky Decl. Ex. K, at MDT_Gauc0122988.) At 8:15 a.m., Mr. Gautney received an alarm to enter his BG reading; at the time of the alarm, he had a SG reading of 59 mg/dL, or Level 2 hypoglycemia. (*See.*) Mr. Gautney did not respond to this alarm at 8:15 am. (Narotzky Decl. Ex. E, Goulden Reb. Dep. 66:2-6.)

A table, taken from Dr. Goulden's expert report, demonstrates Mr. Gautney's SG values beginning 12:00 a.m. on May 17, 2020, through 8:36 a.m. The table shows Mr. Gautney's SG readings were not below 70—*i.e.*, not hypoglycemic—between 7:25 a.m. and 8:00 a.m.:

| Date | Time | Basal Rate (U/h) | Bolus Type | Bolus Volume | Sensor Glucose | SG Time | Alarm |
|---|---|---|---|---|---|---|---|
| 5/17/2020 | 8:36:00 AM | | | | 40 | 8:35:46 AM | AUTO MODE SEVERE LOW SG |
| 5/17/2020 | 8:31:02 AM | | Normal | 0.03 | | | |
| 5/17/2020 | 8:31:00 AM | | | | 40 | 8:30:46 AM | ALERT ON LOW |
| 5/17/2020 | 8:26:01 AM | | | | 40 | 8:25:46 AM | AUTO MODE SEVERE LOW SG |
| 5/17/2020 | 8:21:04 AM | | Normal | 0.03 | 54 | 8:20:46 AM | |
| 5/17/2020 | 8:15:50 AM | | Normal | 0.03 | | | |
| 5/17/2020 | 8:15:48 AM | | | | | | ENTER BG for CL1 |
| 5/17/2020 | 8:15:48 AM | | | | 59 | 8:15:46 AM | AUTO MODE MINIMUM DELIVERY TIMEOUT |
| 5/17/2020 | 8:10:46 AM | | | | 63 | 8:10:46 AM | |
| 5/17/2020 | 8:05:46 AM | | | | 68 | 8:05:46 AM | |
| 5/17/2020 | 8:00:46 AM | | | | 73 | 8:00:46 AM | |
| 5/17/2020 | 7:55:46 AM | | | | 78 | 7:55:46 AM | |
| 5/17/2020 | 7:50:46 AM | | | | 84 | 7:50:46 AM | |
| 5/17/2020 | 7:45:46 AM | | | | 86 | 7:45:46 AM | |
| 5/17/2020 | 7:40:46 AM | | | | 84 | 7:40:46 AM | |
| 5/17/2020 | 7:36:02 AM | | Normal | 0.08 | 81 | 7:35:46 AM | |
| 5/17/2020 | 7:30:58 AM | | | | 75 | 7:30:46 AM | ALERT ON LOW |
| 5/17/2020 | 7:25:46 AM | | | | 70 | 7:25:46 AM | |
| 5/17/2020 | 7:20:46 AM | | | | 66 | 7:20:46 AM | |
| 5/17/2020 | 7:15:46 AM | | | | 66 | 7:15:46 AM | |
| 5/17/2020 | 7:10:46 AM | | | | 66 | 7:10:46 AM | |
| 5/17/2020 | 7:05:46 AM | | | | 65 | 7:05:46 AM | |
| 5/17/2020 | 7:00:46 AM | | | | 63 | 7:00:46 AM | |

All experts, including Dr. Goulden, agree an individual's blood glucose drops after death. (Narotzky Decl. Ex. C, Goulden Dep. 229:17-19; *see also* Narotzky Decl. Ex. E, Goulden Reb. Dep. 9:2-7 ("Q. So can we agree, in general, that death can cause hypoglycemia? A. Yes. Q. And can we agree as well that death will make your blood sugars go down? A. Yes.").) Plaintiff's experts also agree it is not possible to determine when Mr. Gautney died. Dr. Goulden testified: "So I can just rely on the data points of when he reentered the room and, you know, beyond that time, I cannot say what happened to him after that time[.]" (Narotzky Decl. Ex. C, Goulden Dep. 229:24-230:3.) Plaintiff's "rebuttal" pathology expert Dr. William Anderson testified "we cannot tell after his last interaction [with the pump] when he died," (Narotzky Decl. Ex. O, July 20, 2023, Deposition of William Anderson ("Anderson Dep."), 74:6-11), and Plaintiff's "rebuttal" cardiology expert Dr. Ehrin Armstrong agreed at his deposition that "it's reasonable to conclude that Mr. Gautney died and became unresponsive at some point after 7:31 a.m. [. . .] it could have been one minute after 7:31 a.m., could've been five minutes after 7:31 a.m." (Narotzky Decl. Ex. G, Armstrong Dep. 42:7-15.)

## C. Dr. Goulden's Deficient Differential Diagnosis

In performing a differential diagnosis, a physician begins by "ruling in" all scientifically plausible causes, then "rules out" less plausible causes until the most likely cause remains. *Hendrix*, 609 F. 3d at 1195. Though the words "differential

diagnosis" never appear in Dr. Goulden's report, he described his methodology as performing one in so many words: "[M]y opinion is based on the evidence available and to a reasonable degree of medical certainty. I always consider all options when I'm looking through records. Although not explicitly stated in the report, I will consider all factors." (Narotzky Decl. Ex. C, Goulden Dep. 124:22-125:04.)

But Dr. Goulden did not "consider all factors" and certainly did not rule other causes out. Mr. Gautney's T1DM put him at an increased risk of death, including increased risk of sudden cardiac death. (Narotzky Decl. Ex. G, Armstrong Dep. 118:17-24.) In addition, Mr. Gautney had other risk factors for a cardiovascular event—none of which Dr. Goulden discussed in his expert opinions. Specifically, Mr. Gautney was diagnosed with hypertension and hyperlipidemia. (Narotzky Decl. Ex. C, Goulden Dep. 126:14-18.) Dr. Goulden admits that if poorly controlled, those conditions are risk factors for a cardiovascular event. ("Q. Would you also agree that hyperlipidemia and hypertension can on their own make someone susceptible to arrhythmias or other acute cardiac events? A. So they are risk factors if uncontrolled." *Id.* at 270:23-271:4.) Those conditions are not mentioned at all in his expert report. (*Id.* at 127:2-18.) Additionally, Dr. Goulden did not properly "rule in" hypoglycemia, *i.e.,* provide any objective support whatsoever that Mr. Gautney's alleged hypoglycemia, if it contributed to his death at all, was due to a pump malfunction. Instead, Dr. Goulden's expert opinion boils down to nothing more than

an opinion that Mr. Gautney had "excess insulin relative to his requirements" which is, quite simply, the definition of hypoglycemia – as he himself admits:

> Q. …you say that in a patient with type 1 diabetes, the only factor that – which can cause hypoglycemia is exogenous insulin above the individual's requirements.
>
> A. Exogenous insulin relative to their requirements which may be determined by a number of factors.

(Narotzky Decl. Ex. C, Goulden Dep. 70:8-14.) When asked whether "aside from stating that there was an excess delivery of insulin," he examined any other possible causes of Mr. Gautney's death, he admitted he singularly "focus[ed] very much on that point of excess insulin relative to requirements." (*Id*. at 131:21-132:17.) Dr. Goulden just could "not see another reason" for the drop in Mr. Gautney's insulin, despite not discussing any other reasons in his report. (*Id*. at 132:24-133:18.)

### D. Dr. Goulden's Belated Misinterpretation of Medtronic Data

In his rebuttal report, Dr. Goulden for the first time relies on a small subset of Medtronic data related to predicted sensor glucose ("SG") values. (Narotzky Decl. Ex. N, June 27, 2023, Rebuttal Report of Peter Goulden, M.D. ("Goulden Reb. Rep.") at 3.) Dr. Goulden relies on predicted SG values to claim that a predicted drop between 7 a.m. and 8 a.m. on May 17, 2020, is consistent with Mr. Gautney allegedly having excess insulin and inconsistent with the theory that the only reason Mr. Gautney's interstitial glucose levels were dropping was because he was

deceased. This represents the entirety of Dr. Goulden's attempt to perform a differential diagnosis by ruling *out* another explanation or ruling *in* his theory.

But Dr. Goulden misrepresents what the predicted SG values represent, and also incorrectly interpreted the data. There is both the actual SG value read by the Continuous Glucose Monitoring device; as well as the predicted SG value calculated by the pump. The predicted SG value is predicting the SG value for a future point in time. As explained in the User Guide for Mr. Gautney's Device, "The predicted sensor glucose level is calculated using the current sensor glucose level, the derivative of previous sensor glucose readings, the trend or the slope of the sensor glucose readings, and the amount of early warning duration the user selects." (Narotzky Decl. Ex. H, User Guide, Ch. 16., at MDT-123773.)

When presented with proof that his understanding of predicted SG was inaccurate, Dr. Goulden conceded that for the time period in question, the actual SG levels were *lower than* the predicted SG values:

> Q.     So after 8:00 a.m., the actual sensor glucose values were lower than the predicted sensor glucose values, correct?
>
> A.     That is correct.

(Narotzky Decl. Ex. E, Goulden Reb. Dep. 30:11-14.) Therefore, Dr. Goulden's attempt to use the predicted SG value—which he incorrectly interpreted to be *lower*

than the actual SG values—has no support in the data, even within the small subset of cherrypicked data he used.

### III.   LEGAL STANDARD

This Court's "gatekeeper" role is designed to ensure that "speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *U.S. v. Frazier*, 387 F. 3d 1244, 1260 (11th Cir. 2004) (*citing McCorvey v. Baxter Healthcare Corp.*, 298 F. 3d 1253, 1257 (11th Cir. 2002)) (internal quotations, italics, and brackets omitted); *Lee-Bolton*, 319 F. R. D. at 371 (quoting *Hendrix*, 609 F. 3d at 1194).

Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert testimony, with a few amendments going into effect in December 2023 (amendments noted by underlining):

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if <u>the proponent has demonstrated by a preponderance of the evidence that</u>:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

(d) the <u>expert's opinion reflects a reliable application of</u> the principles and methods to the facts of the case.

FRE 702.

These amendments do not substantively change the rule, instead clarifying the existing rule in two important aspects. First, the amendment clarifies that the proponent of the evidence must demonstrate all the requirements of Rule 702 by a preponderance of the evidence standard. *See also Rink v. Cheminova, Inc.*, 400 F. 3d 1286, 1292 (11th Cir. 2005) (citing *Allison v. McGhan Med. Corp.*, 184 F. 3d 1300, 1306 (11th Cir. 1999)). Second, the amendment clarifies that the testifying expert's opinion must stay within the bounds of what can be concluded by a reliable application of the expert's basis and methodology. *See also United States v. Barton*, 909 F. 3d 1323, 1332 (11th Cir. 2018) (finding that expert's opinions "were based on reliable methods and sufficiently reliable application of those methods….").

"In determining the admissibility of expert testimony under Rule 702, [trial courts] engage in a rigorous three-part inquiry" wherein they must consider whether:

a) the expert is qualified to testify competently regarding the matters he intends to address;
b) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by Daubert; and
c) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Frazier,* 387 F. 3d at 1260 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). These criteria are often referred to as qualification, reliability, and helpfulness. *Id.*

## IV.    ARGUMENT AND AUTHORITIES

### A.    Dr. Goulden Is Not Qualified To Opine On Pump Operations And In Any Event, Did Not Reliably Rule In Pump Malfunction Causing Hypoglycemia

#### 1.    Dr. Goulden Admits his Lack of Pump Operation Qualifications and his Lack of Knowledge Regarding Mr. Gautney's Device and the Alleged Malfunction

"To meet the qualification requirement, a party must show that its expert has sufficient knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Adkins v. Roberts,* Case No. 5:18-cv-271-MCR/MJF, 2022 WL 1272403, at *3; 2022 U.S. Dist. LEXIS 79682, at *9 (N.D. Fla. Mar. 31, 2022) (quoting *Hendrix*, 609 F. 3d at 1193) (internal quotations omitted). Dr. Goulden admits he has no actual opinion regarding malfunction of Mr. Gautney's insulin pump and ***admits he's not qualified to offer one***:

> Q.    Did you ask to see information on how the pump functioned and tested here, the pump at issue?
>
> A.    So my opinion is based on the medical records and the glucose monitoring. And I would defer to the – an – the engineer in terms of the function of the pump.

(Narotzky Decl. Ex. E, Goulden Reb. Dep. 87:12-18; *see also id.* at 90:10-91:3 ("…I'm just saying I'm not an engineer. I'm an endocrinologist. So I just don't want

to – I want to stay in my lane…").) Dr. Goulden is not offering any specific opinions on "whether or how the pump could potentially have delivered beyond what was programmed." (Narotzky Decl. Ex. C, Goulden Dep. 111:24-112:6, 112:15-113:8, 114:8-18.) Indeed, Dr. Goulden did not even consider the actual insulin pump at issue – he did not assess the pump or how the claimed over-delivery allegedly occurred (*id*. at 87:12-18), he does not know what Plaintiff's defect theory is (*id*. at 88:24-89:19 (deferring to Mr. Clemens)), nor does he know how the pump tested or performed (*id*. at 85:22-86:5 ("Q. ... are you aware of testing here that shows the insulin pump at issue delivered insulin accurately? A. No… I'm not aware of a testing; just purely my opinion's based on the medical records.".))

Instead, Dr. Goulden is relying on and "defer[ring] to" the opinion from Mr. Clemens, Plaintiff's technical expert, regarding pump malfunction, even though Dr. Goulden did not recall reading Mr. Clemens' report or how the alleged malfunction took place. (*Id*. at 87:12-18, 88:6-23.) Dr. Goulden was not even aware the pump was tested:

> Q.     Are you aware the pump was able to deliver insulin accurately when tested by plaintiff's expert?
>
> A.     Well, I'm glad to hear that. I have not seen that. I did not see that. I have not seen that report that you're referring to. I don't think that was in the supplemental materials that I used for my rebuttal report.

(*Id*. at 84:10-13.)

He went on to confirm he had no knowledge regarding any possible or alleged malfunction of Mr. Gautney's pump:

> Q.     On his specific pump, are you aware that you can fully install a reservoir into the pump and into the pump's retainer ring?
>
> A.     I – I have not – I have not reviewed – so this is – I would like to review that report. I've reviewed the medical records, but I would need to see that information to be able to comment further.

(*Id*. at 87:4-11.)

In fact, the ***only*** opinion Dr. Goulden has regarding Mr. Gautney's insulin pump is that it "really assisted Mr. Gautney with *cutting back* on the number of severe hypoglycemic events he was having." (Narotzky Decl. Ex. C, Goulden Dep. 321:11-20.) That opinion is not surprising, given that Dr. Goulden continues to prescribe Medtronic insulin pumps to his patients today. (*Id.*, at 41:10-15.) For Dr. Goulden to prescribe the pump in his practice—having presumably analyzed the risks and benefits of this therapy—but still offer an opinion that the same pump delivered unrecorded, unintended insulin would mean Dr. Goulden employs a different analysis in the courtroom than he does in his practice. That would present a problem for Dr. Goulden. *See McClain*, 401 F.3d at 1237 ("the trial court must 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). But Dr.

Goulden avoids that concern—affirmatively ignoring all the physical evidence of the pump and retainer ring as well as the repeated pump testing in the years after the event showing performance exactly in line with specifications—by declining to express any opinion at all on the pump's function.

Thus, for Dr. Goulden to opine on the cause of Mr. Gautney's death, he must rely on Mr. Clemens' opinions about the insulin pump at issue. Mr. Clemens' opinions are unreliable for the reasons discussed in the concurrently filed motion to exclude. But in any event, Mr. Clemens does not opine Mr. Gautney's pump malfunctioned. Rather, he opines Mr. Gautney's death was due to Mr. Gautney allegedly tightening the P-cap into the pump's retainer ring while the infusion set was connected to his body. (*See generally* Motion to Exclude Charles Clemens, pp. 9-10, citing to Clemens deposition and Reports.) If anything, that is a failure to follow the instructions for using the pump—and Dr. Goulden confirmed that, "with regards to the instructions, the warnings, I personally do not have any critique of the instructions." (Narotzky Decl. Ex. C, Goulden Dep. 117:16-21.) Dr. Goulden's reliance on Mr. Clemens' opinions does not render him qualified to testify regarding any alleged malfunction of Mr. Gautney's Device.

## 2. Dr. Goulden did not Reliably "Rule In" Pump Malfunction; He Failed to Account for Other Causes of Death and Other Reasons for Any Alleged Hypoglycemia

Dr. Goulden also has no reliable basis to conclude that Mr. Gautney's low sensor glucose readings after 7:31 a.m. occurred *before* he was dead and/or incapacitated, as opposed to after he had died. Dr. Goulden therefore cannot, and did not, rule out that Mr. Gautney died *before* his sensor glucose began to drop precipitously. Dr. Goulden admits blood glucose levels drop after someone dies. (*Id.* at 229:17-19.) The last time Mr. Gautney touched or interacted with a button on his pump was at 7:31 a.m. on May 17. (*Id.* at 226:25-227:10.) At 8:15 a.m., Mr. Gautney's SG was a 59 (Level 1 hypoglycemia) and yet he failed to interact with the pump or address its alarms. (*Id.* at 227:17-228:6.) Thus, Dr. Goulden does not (and cannot) know the exact time Mr. Gautney passed, or if he had already died by 8:15 a.m. (*Id.* at 229:10-16, 229:20-230:4.) If an expert fails to rule out possible factors, "his opinion on the 'cause'" of injury is "not based upon a proper differential diagnosis" and "[t]herefore . . . not base[d] . . .on a reliable methodology." *Perez v. Canada Life Assur. Co.,* No. 09-61227-CIV, 2010 WL 3894491, at *4 (S.D. Fla. Oct. 1, 2010). Dr. Goulden cannot rule out that Mr. Gautney had died while his blood glucose was in a normal and not hypoglycemic range.

There are also many causes of hypoglycemia aside from pump failure, of which Dr. Goulden is aware, but he fails to discuss any in his report. Dr. Goulden

admits hypoglycemia is a fact of life for patients with Type I diabetes and explains it "can occur in the absence of a malfunction"—and "it does routinely." (Narotzky Decl. Ex. C, Goulden Dep. 82:13-83:6; 83:21-84:7.) He acknowledges that excessive insulin can occur for many reasons (*id.* at 70:22-71:6.), including exercise (*id.* at 79:5-16), alcohol use (*id.* at 81:15-17) pump settings such as basal insulin that is too high (*id.* at 72:10-15), insulin to carb ratio that is not set appropriately (*id.* at 72:16-20, 186:4-22), or a patient whose insulin sensitivity factor is set incorrectly (*id.* at 72:21-73:2). Yet his report fails to address *any* of these possible scenarios. Dr. Goulden does not provide any reasoning for ruling any of them out, beyond his own *ipsi dixit*, rendering his opinions unreliable. "An important factor under *Daubert* is the testability of an expert's conclusions and theory, which includes the ability to rule out other potential explanations." *United States v. Marks*, No. 11-80072-CR, 2013 WL 4584032, at *3 (S.D. Fla. Aug. 6, 2013). Dr. Goulden fails to explain why he ignored alternate causes.

Further, and perhaps as a result of his lack of qualification to opinion on the pump, Dr. Goulden did not reliably rule in an over-delivery of insulin causing hypoglycemia as the cause of Mr. Gautney's death. At the first, "rule in" step, Dr. Goulden should have "compil[ed] a comprehensive list of potential causes for the symptoms under investigation." *In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2011 WL 7109295, at *6 (S.D. Fla. Feb. 4, 2011) (citing *McClain*, 401 F.3d at 1253).

Dr. Goulden did no such thing, so his opinion should be excluded. *See In re Denture Cream Prods. Liability Lit.*, 795 F.Supp.2d 1345, 1366 (S.D. Fla. 2011 (excluding expert when a "problem with [his] differential diagnosis is that he did not rule-in all possible causes before he started ruling things out.").

Mr. Gautney had multiple instances of hypoglycemia and falling blood glucose levels that Dr. Goulden does *not* attribute to his pump. For example, the day before his death, Mr. Gautney had a drop in blood glucose from 179 to below 75 after a morning bolus. (*Id.* at 148:8-25.) When explicitly asked, Dr. Goulden did not offer an opinion that *that* drop the day before was "the result of unprogrammed insulin from the pump." (*Id.* at 151:2-24.) The night before his death, Mr. Gautney had pizza; taking insulin to try to cover for consumption of pizza is difficult and can cause prolonged hypoglycemia. (*Id.* at 166:12-17; 168:22-169:22.) Mr. Gautney also had a blood glucose as low as 29 on June 27, 2018, which was *prior* to his use of the pump at issue. (*Id.* at 252:6-20.) Dr. Goulden is not claiming any of those events "were caused by an unprogrammed over-delivery of insulin from a prior pump." (*Id.* at 252:21-25.) Mr. Gautney had multiple previous episodes of Level 2 hypoglycemia in 2018, 2019, 2020, and earlier, but Dr. Goulden was only aware of some of those and did not include any in his report. (*Id.* at 241:9-16, 242:25-245:2, 129:7-11, 132:24-133:12.)

The **only** instance of hypoglycemia in Mr. Gautney's medical history that Dr. Goulden attributes to his insulin pump is a speculative and unprogrammed hypothetical bolus the morning of his death. But because Dr. Goulden did not appropriately rule in that cause, his opinion does not satisfy the Eleventh Circuit's differential diagnosis criteria and his opinion should be excluded.

**B.**   **Dr. Goulden's Opinions are Not Reliable Because He Did Not Rule Out Other Potential Causes of Death**

If an expert fails to rule out possible factors, "his opinion on the 'cause'" of injury is "not based upon a proper differential diagnosis" and "[t]herefore . . . not base[d] . . .on a reliable methodology." *Perez*, 2010 WL 3894491, at *4. "[U]nder *Daubert* and Rule 702, it is not sufficient for an expert to merely adduce an opinion and label it 'differential diagnosis;' as with all else in the *Daubert* realm, the expert's opinion that a causal relationship exists must be the product of verifiable, scientifically reliable methods." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 596 (N.D. Fla. 2009) *aff'd sub nom. Hendrix*, 609 F. 3d 1183.

In performing a differential diagnosis, a physician begins by "ruling in" all scientifically plausible causes, then "rules out" the least plausible causes until the most likely cause remains. *Hendrix*, 609 F. 3d at 1195**.** An expert cannot reliably rule out (or in) possible causes by ignoring and then dismissing contrary evidence - a reliable differential diagnosis requires more. *McDowell v. Brown,* 392 F. 3d 1283, 1300-01 (11th Cir. 2004) (excluding specific causation testimony from experts who

failed to "mete out" various contributors or "quantify" their effect on plaintiff's injuries). "An important factor under *Daubert* is the testability of an expert's conclusions and theory, which includes the ability to rule out other potential explanations." *United States v. Marks*, No. 11-80072-CR, 2013 WL 4584032, at *3 (S.D. Fla. Aug. 6, 2013). Here, Dr. Goulden did not "consider all factors" and certainly did not rule other causes of Mr. Gautney's death, including a cardiovascular event unrelated to acute hypoglycemia.

Dr. Goulden is not a cardiologist, (Narotzky Decl. Ex. C, Goulden Dep. 15:21-25), and is "not providing any cardiology opinions in this case." (*Id.* at 16:2-4.) Dr. Goulden was not asked to give a general opinion regarding the cause of Mr. Gautney's death, but rather to consider only hypoglycemia and the role it may have played. (*Id.* at 106:17-25, 107:2-8.) Despite conceding that heart disease is "one of the top leading causes of death . . . particularly in patients with diabetes" (Narotzky Decl. Ex. E, Goulden Reb. Dep. 93:15-95:11), Dr. Goulden summarily dismissed— rather than ruled out—the possibility that Mr. Gautney's death was due to cardiac induced death due to his multiple co-morbidities. In fact, hypertension and hyperlipidemia are not mentioned *at all* in his expert report, two significant conditions with which Mr. Gautney was diagnosed. (Narotzky Decl. Ex. C, Goulden Dep. 126:14-18; 127:2-18**.**)

An expert cannot reliably rule out (or in) possible causes by ignoring and then dismissing contrary evidence. A reliable differential diagnosis requires more. *McDowell*, 392 F.3d at 1300-01. In his rebuttal report, Dr. Goulden for the first time noted some of Mr. Gautney's comorbidities (Narotzky Decl. Ex. N, Goulden Reb. Rep. at 4-5), but dismissed them in a *post hoc* justification, concluding: "risk factors do not equate to causation." (*Id.* at 5.) Rather than considering all the evidence, Dr. Goulden simply dismisses anything contrary to his opinions. (*Cf.* Narotzky Decl. Ex. N, Goulden Reb. Rep. p. 4 (stating Mr. Gautney's blood pressure was "getting better") with Narotzky Decl. Ex. E, Goulden Reb. Dep. 100:22-101:10 (admitting June 2019 blood glucose was hypertensive stage 2 but dismissing that data as "one isolated blood pressure"), and *id.* p. 102:8-17 (admitting January 2020 blood pressure was hypertensive stage 2 but dismissing that data because he "would want to repeat to corroborate").) In two reports and under two sessions of deposition questioning, Dr. Goulden has yet to provide a reasoned explanation for why these multiple risk factors could be ruled out. He fails to conduct a true differential diagnosis, and his opinions are therefore unreliable.

## C.  Dr. Goulden Lacks Good Grounds to Opine Medtronic Predicted SG Data Supports His Theory

"The *Daubert* 'requirement that the expert testify to scientific knowledge—conclusions supported by **good grounds** for each step in the analysis—means that any step that renders the analysis unreliable under the *Daubert* factors renders the

expert's testimony inadmissible.'" *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005), emphasis supplied. If any step in Dr. Goulden's analysis is *not* supported by good grounds, that provides an independent basis for finding his opinion unreliable and inadmissible.

When criticized by Medtronic's experts for his lack of support for his opinion, for the first time in his rebuttal report Dr. Goulden presents a new analysis based on a small window of predicted SG values from the pump data. In his rebuttal report, Dr. Goulden argues Mr. Gautney's SG data, recorded by his CGM, demonstrates he was receiving excess insulin because the *predicted* SG value was lower than the *actual* SG value. (Narotzky Decl. Ex. N, Goulden Reb. Rep. at 2-4.) But his report and deposition testimony demonstrate that he misinterpreted the data.

Dr. Goulden stated in his rebuttal report, and at his deposition, that Mr. Gautney's predicted SG values, shown on his CGM report, were lower than his actual SG values. (*Id.* at 2-4.) According to Dr. Goulden, predicting that SG will lower is evidence of an excess of insulin and inconsistent with Defendants' experts' opinions that the only reason Mr. Gautney's interstitial glucose levels were dropping was because he was dead. (*Id.* at 2-4.) Dr. Goulden's interpretation of Mr. Gautney's CGM and pump data relies on his theory that when a sensor glucose reading is predicted, it will take place in the next "five-to-10-minute period." (Narotzky Decl. Ex. E, Goulden Reb. Dep. 12:5-14).

When presented with proof that his understanding of predicted SG was inaccurate, Dr. Goulden conceded that the predicted SG values were *higher* than the actual SG values. (*Id*. at 30:11-14.) Dr. Goulden's attempt to use the predicted SG—which he interpreted to be lower than the actual SG values—has no support in the data. Dr. Goulden's analysis of that data is therefore unreliable, which is "a fatal defect under *Daubert*." *McClain*, 401 F. 3d at 1244–45 (affirming exclusion of expert where "[t]he conclusions that [the expert] draws . . . are very important to his opinions, but he did not show the reliability of each of his steps"). He does not have good grounds – or any demonstrated grounds – for this opinion and therefore it should be excluded.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion to exclude the expert reports and testimony of Peter Goulden, M.D. should be granted.

## RULE 37 CERTIFICATION

In accordance with Federal Rule of Civil Procedure 37 and Northern District of Florida Local Rule 7.1(B)-(C), the undersigned certifies that movant has in good faith conferred or attempted to confer with opposing counsel regarding the opinions and testimony of Peter Goulden, M.D.

# CERTIFICATE OF WORD COUNT

In accordance with Northern District of Florida Local Rules 7.1(F), 56.1(B) & 56.1(E), the undersigned certifies that the memorandum above contains 6,354 words.

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**

*s/Nicole E. Narotzky*
John K. Londot, Esq.
Florida Bar No. 579521
GREENBERG TRAURIG LLP
101 E College Ave.
Tallahassee, FL  32301
Telephone: (850) 222-6891
Facsimile: (850) 681-0207
Email:  londotj@gtlaw.com

Nicole E. Narotzky, Esq. (admitted *pro hac vice*)
Thomas R. Pack, Esq. (admitted *pro hac vice*)
Ann E. Motl, Esq. (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN  55402
Telephone: (612) 259-9751
Fax: (612) 677-3101
Email:  narotzkyn@gtlaw.com
packt@gtlaw.com
ann.motl@gtlaw.com

and
Rodney M. Hudson, Esq. (admitted *pro hac vice*)

GREENBERG TRAURIG, LLP
101 Second Street, Suite #2200
San Francisco, CA  94105-3668
Telephone: (415) 655-1317
Email:  hudsonr@gtlaw.com

*Counsel for Defendant
Medtronic MiniMed, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following: J. Scott Murphy, Esq. (scott@pkblawfirm.com) and Andrew F. Knopf, Esq. (andrew@pkblawfirm.com) of Paul, Knopf, Bigger Law Firm.


*s/Nicole E. Narotzky*
Nicole E. Narotzky, Esq.