# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CARLA WIGGINS, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF CARLTON D. GAUTNEY, JR.,

       Plaintiff,

v.

MEDTRONIC MINIMED, INC.,

       Defendant.

Case No. 3:22-cv-02781-MCR-EMT

## MEMORANDUM IN SUPPORT OF
## DEFENDANT MEDTRONIC MINIMED, INC.'S
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...................................................................................3

I.  Mr. Gautney's Insulin Pump, the MiniMed 670G, is an FDA-Approved
    Class III Medical Device Subject to PMA .....................................................3

II. Mr. Gautney's Pump Left MiniMed's Control Free of Defects, and
    Continued to Function Properly When Used According to FDA-
    Approved Instructions ......................................................................................6

    A.  Mr. Gautney's pump was defect-free when it left MiniMed's
        control........................................................................................................6

    B.  Mr. Gautney was an experienced pump user whose pump worked
        as designed in the month before his death. ...........................................9

    C.  Plaintiff's expert's unsupported theory is unrelated to her
        manufacturing-defect claims. ...............................................................11

    D.  Mr. Gautney's pump functioned properly in subsequent testing
        by both MiniMed and Plaintiff's expert.............................................17

LEGAL STANDARD.................................................................................20

ARGUMENT ..................................................................................................20

I.  All of Plaintiff's Claims are Preempted by Federal Law ............................20

    A.  Plaintiff's claims are preempted because Mr. Gautney's pump
        was not manufactured in violation of a particular federal
        requirement........................................................................................22

    B.  Plaintiff's claims are also preempted because she cannot show a
        causal link between a particular violation of federal requirements
        and Mr. Gautney's death. .................................................................26

II. Plaintiff's Manufacturing-Defect Claims Independently Fail Under
    Florida Law........................................................................................29

i

III.    Plaintiff Is Not Entitled to Punitive Damages ................................................32

CONCLUSION .......................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. North Carolina*,
   130 S. Ct. 2295 (2010)......................................................................20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................20

*Ault v. Lohr*,
   538 So. 2d 454 (Fla. 1989) ..............................................................33

*Bentzley v. Medtronic, Inc.*,
   827 F. Supp. 2d 443 (E.D. Pa. 2011).................................................24

*Bledsoe v. Medtronic, Inc.*,
   635 F. Supp. 3d 654 (N.D. Ind. 2022) ..............................................24

*Carter v. Medtronic, Inc.*,
   2020 WL 2319729 (S.D. Ohio May 11, 2020)...................................24

*Citizens Prop. Ins. Corp. v. Simkar LLC*,
   813 F. Supp. 2d 1356 (M.D. Fla. 2011).............................................29

*Duran v. Miller, M.D.*, 2017 WL 3254989 (Cal. Super. Ct. July 26, 2017) ..........24

*Erickson v. Bos. Sci. Corp.*,
   846 F. Supp. 2d 1085 (C.D. Cal. 2011) ............................................10

*Funk v. Stryker Corp.*,
   631 F.3d 777 (5th Cir. 2011) ...........................................................25

*Funk v. Stryker Corp.*,
   673 F. Supp. 2d 522 (S.D. Tex. 2009)...............................................25

*Godelia v. Doe 1*,
   881 F.3d 1309 (11th Cir. 2018) ........................................................22

*Harduvel v. Gen. Dynamics Corp.*,
   878 F.2d 1311 (11th Cir. 1989) ........................................................31

*Horn v. Bos. Sci. Neuromodulation Corp.*,
   2011 WL 3893812 (S.D. Ga. Aug. 26, 2011)......................................................22

*In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*,
   623 F.3d 1200 (8th Cir. 2010) ........................................................................21

*Kubicki on behalf of Kubicki v. Medtronic, Inc.*,
   293 F. Supp. 3d 129 (D.D.C. 2018).................................................................22

*Leroy v. Medtronic, Inc.*,
   2015 WL 4600880 (N.D. Fla. July 29, 2015)............................................. 10, 21

*Loomis v. Medtronic, Inc.*,
   2005 WL 1828763 (N.D. Ohio Aug. 1, 2005)...................................................24

*Lowery v. Sanofi-Aventis LLC*,
   535 F. Supp. 3d 1157 (N.D. Ala. 2021)..................................................... 21, 26

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)........................................................................................20

*Nunez v. Coloplast Corp.*,
   461 F. Supp. 3d 1260 (S.D. Fla. 2020).............................................................34

*Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*,
   329 F. App'x 257 (11th Cir. 2009) ..................................................................32

*Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*,
   625 F. Supp. 2d 1198 (S.D. Fla. 2008).............................................................32

*Riegel v. Medtronic, Inc.*,
   552 U.S. 312 (2008)................................................................................ passim

*Salinero v. Johnson & Johnson*,
   400 F. Supp. 3d 1334 (S.D. Fla. 2019)...................................................... 29, 31

*Salinero v. Johnson & Johnson*,
   995 F.3d 959 (11th Cir. 2021) ........................................................................29

*Walker v. Medtronic, Inc.*,
   670 F.3d 569 (4th Cir. 2012) ..........................................................................25

*Weber v. Allergan, Inc.*,
940 F.3d 1106 (9th Cir. 2019) ...............................................................25

*Wolicki-Gables v. Arrow Int'l, Inc.*,
634 F.3d 1296 (11th Cir. 2011) ..................................................... passim

**Statutes**

21 U.S.C. § 360c(a)(1)(C)(ii)....................................................................3, 24

21 U.S.C. § 360e(d) ...................................................................................3, 4

21 U.S.C. § 360k(a) ........................................................................ 1, 4, 23, 28

21 U.S.C. §§ 301–399f...................................................................................3

Cal. Civ. Proc. Code § 377.61 ...................................................................33

Fla. Stat. Ann. § 768.72(2)..........................................................................33

**8**

21 C.F.R. § 814.80 .........................................................................................4

Fed. R. Civ. P. 56(a)....................................................................................20

**9**

Fla. Std. Jury Instr. (Civil) PL 4................................................................29

Pursuant to Federal Rule of Civil Procedure 56(a) and Northern District of Florida Local Rule 56.1, Defendant Medtronic MiniMed, Inc. ("Medtronic MiniMed" or "MiniMed") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment on both counts in Plaintiff's Complaint.

## INTRODUCTION

In this case, Plaintiff alleges a narrow claim: that Carlton Gautney, Jr. was injured by a purported manufacturing defect in his portable insulin pump. Medtronic MiniMed is entitled to summary judgment on Plaintiff's claims because the evidence conclusively establishes that Mr. Gautney's pump, a life-sustaining Class III medical device with premarket approval ("PMA"), was manufactured in compliance with its FDA-approved specifications and was free from any defects at the time it left MiniMed's control. As a result, Plaintiff's claims are expressly preempted by federal law pursuant to 21 U.S.C. § 360k(a), as interpreted by *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008). Because Plaintiff cannot prove Mr. Gautney's pump had a manufacturing defect when it left MiniMed's control—or at any other time—her claims also independently fail as a matter of Florida law.

Faced with undisputed evidence establishing the absence of a manufacturing defect, Plaintiff's expert advances a different theory: that Mr. Gautney's pump delivered an accidental infusion of insulin due to an improperly loaded insulin reservoir. That speculative, unsupported theory cannot create a fact issue because it

has no causal connection with Plaintiff's claim that the pump's retainer ring was *manufactured* defectively. Because *all* insulin pumps can malfunction when the insulin reservoir is loaded contrary to FDA-approved instructions, Plaintiff's claims are, at most, directed at a *design* defect—a claim Plaintiff does not assert, and one that would be unequivocally preempted if she did.

Moreover, even if Plaintiff could show that Mr. Gautney's pump delivered an excess of insulin, that fact could not defeat summary judgment given the device's PMA status. The FDA grants PMA to Class III medical devices despite knowing that they may, in some instances, cause injury. And here, when approving Mr. Gautney's pump, the agency specifically and publicly acknowledged the potential risk of insulin over-delivery. The FDA nevertheless approved the device given its lifesaving benefits. In cases like this, a plaintiff's burden is not merely to prove a malfunction or injury—instead, Plaintiff must prove that the device was manufactured defectively and in violation of PMA requirements. As a matter of law, the undisputed evidence precludes Plaintiff from doing so.

Regardless of whether her claims survive summary judgment, Plaintiff is not entitled to punitive damages under applicable law.

Because federal law preempts Plaintiff's claims, her claims fail under state law, and her user error theory is unsupported and irrelevant to the claims she has raised, the Court should grant summary judgment in MiniMed's favor.

**STATEMENT OF FACTS**

I.    <u>Mr. Gautney's Insulin Pump, the MiniMed 670G, is an FDA-Approved Class III Medical Device Subject to PMA</u>

A federal regulatory framework applies to Class III medical devices like the insulin pump at issue in this case. The Medical Device Amendments ("MDA") to the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–399f, "swept back some state obligations and imposed a regime of detailed federal oversight" on medical device manufacturers. *Riegel*, 552 U.S. at 316. Class III devices are those "for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or which "present[] a potential unreasonable risk of illness or injury." *Id.* at 317 (quoting 21 U.S.C. § 360c(a)(1)(C)(ii)).

Class III devices like the MiniMed 670G insulin pump system receive the greatest scrutiny under this framework: before being marketed, they must receive PMA, "a 'rigorous' process" during which the FDA spends on average 1,200 hours reviewing detailed information about a device's proposed design, manufacture, and labeling. *Riegel*, 552 U.S. at 317–18 (citation omitted). The FDA "grants premarket approval only if it finds there is a 'reasonable assurance' of the device's 'safety and effectiveness.'" *Id.* at 318 (citing 21 U.S.C. § 360e(d)).

If the FDA grants PMA, the MDA generally "forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing

processes, labeling, or any other attribute, that would affect safety or effectiveness." *Id.* at 319 (citing § 360e(d)(6)(A)(i)); *see also* 21 C.F.R. § 814.80. FDA oversight of PMA devices continues after approval, including monitoring and regulating product manufacturing, labeling, and marketing, as well as any design changes affecting safety or effectiveness. *Riegel*, 552 U.S. at 319. To make changes, the manufacturer "must submit, and the FDA must approve, an application for supplemental premarket approval, to be evaluated under largely the same criteria as an initial application." *Id.*

The exclusive nature of this federal regulatory framework means that most state-law claims related to Class III devices are expressly preempted. Congress gave the FDA exclusive authority to regulate Class III devices, decreeing that no state "may establish or continue in effect with respect to a device ... any requirement[] (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device …." 21 U.S.C. § 360k(a). Thus, absent a deviation from PMA requirements, state-law claims challenging the design, manufacture, or labeling of a Class III device are expressly preempted. *Riegel*, 552 U.S. at 321–25. Although this leaves some injured persons without judicial recourse, the Supreme Court held in *Riegel* that preemption is required by the statute and ultimately serves the public interest because many more

people "would suffer without new medical devices if juries were allowed to apply the tort law of 50 states to all innovations." *Id.* at 326.

The Class III medical device at issue in this case is the MiniMed 670G insulin pump system (the "670G"). The 670G is a programmable, battery-operated pump that delivers micro-boluses of insulin from a reservoir for the management of Type I diabetes. (Ex. A, FDA, Summary of Safety and Effectiveness Data (SSED) for PMA P160017 (MiniMed 670G System), at 3, *available at* https://www.accessdata.fda.gov/cdrh_docs/pdf16/p160017b.pdf ("670G SSED").) The 670G was subject to PMA before it could be sold in the United States. (*Id.* at 1); *Riegel*, 552 U.S. at 317–18 (citation omitted). Plaintiff does not and cannot dispute that the FDA reviewed all aspects of the 670G's design, manufacture, and labeling, initially granting PMA on September 28, 2016. (*See, e.g.*, Ex. A, 670G SSED at 1.) The 670G PMA application contained detailed manufacturing specifications, including specifications for the materials used in the retainer ring and pump case, as well as how those materials were to be welded together. (*See* Ex. B, 3/9/23 Clemens Dep. at 42:23–43:6, 44:14–18; Ex. C, Amato Dep. at 210:14–22.)

Critically, in its publicly available Summary of Safety and Effectiveness concerning the 670G, the FDA made clear it was aware of the risk of hypoglycemia due to accidental insulin delivery. (Ex. A, 670G SSED at 13.) The FDA nevertheless found that the device's lifesaving benefits to patients outweighed this and other

potential risks, warranting the device's approval. It is further undisputed that the FDA has never withdrawn, suspended, or revoked its approval of the MiniMed 670G. (*See* Ex. C, Amato Dep. at 210:7–25; Compl. ¶ 22; Ex. D, FDA, Premarket Approval (PMA) P160017, *available at* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P160017.) PMA for the 670G was in place, and the device was FDA-approved, when Mr. Gautney's specific 670G at issue was shipped to him on April 8, 2019. (*See* Ex. C, Amato Dep. at 210:7–10; Ex. E, Davila Decl. ¶¶ 20–21.) The event at issue occurred on May 17, 2020. (Compl. ¶ 3.)

II.    Mr. Gautney's Pump Left MiniMed's Control Free of Defects, and Continued to Function Properly When Used According to FDA-Approved Instructions

The undisputed evidence shows that Mr. Gautney's 670G insulin pump functioned within the FDA-approved PMA specifications both at the time the pump left MiniMed's control and at all times the pump was subsequently tested. Plaintiff's only support for her claims is her expert's speculative theory that, notwithstanding the undisputed evidence that Mr. Gautney's pump had no manufacturing defect at the time it left MiniMed's control, Mr. Gautney received an accidental infusion of insulin when Mr. Gautney loaded his pump's reservoir contrary to FDA-approved instructions.

A.    **Mr. Gautney's pump was defect-free when it left MiniMed's control.**

According to MiniMed's extensive device-tracing records, Mr. Gautney's specific 670G was free of defects when it left MiniMed's control in April 2019. (Ex. E, Davila Decl. ¶ 21.) Eric Davila Lozada, a Senior Engineering Manager for MiniMed, testified that "[e]very MiniMed 670G Pump that is manufactured is subject to a carefully controlled manufacturing process and run through a series of quality assurance tests throughout the production process." (*Id.* ¶ 13.) As part of the PMA application for the 670G, MiniMed submitted a document to the FDA that "outlines each manufacturing step . . . and the requirements for validation." (*Id.* ¶ 15.) Because the 670G is individually manufactured (as opposed to being manufactured in lots), the manufacturing process outlined in the PMA allows each 670G to be traced by a specific serial number. (*Id.* ¶ 16.) The entire manufacturing process for each individual 670G is recorded on a form called a device history record ("DHR"), which is maintained among MiniMed's business records. (*Id.* ¶ 17.) The process documented in each pump's DHR includes "extensive testing and inspection to assure that [each pump] conforms to the PMA-approved design requirements and specifications" and to "assure compliance with the design, quality, and manufacturing specifications in the PMA." (*Id.* ¶ 19.)

MiniMed manufactured Mr. Gautney's pump according to the FDA-approved specifications. The DHR for Mr. Gautney's specific 670G (serial number NG1814838H) confirms that the pump, including the retainer ring, "met all of

Medtronic's FDA PMA-approved specifications, passed each quality assurance inspection and test, and was free from any manufacturing defect at the time it was released for sale." (*Id.* ¶ 21, *see also* ¶ 45.) Mr. Gautney's pump case was inspected at MiniMed's facility in Northridge, California before its release on January 29, 2019, and all characteristics of the pump case were certified in conformance and passed inspection—including the retainer ring and its weld interface with the pump case. (*Id.* ¶¶ 12, 22.) Mr. Gautney's pump was further inspected multiple times after being shipped to complete manufacturing at Medtronic's Juncos Campus in Puerto Rico, where the assembly process for Mr. Gautney's pump included 34 separate steps involving visual inspection of the retainer ring. (*Id.* ¶ 15.) Mr. Gautney's ring passed all inspections and tests both at the Northridge MiniMed facility and the Juncos Campus. (*Id.* ¶¶ 22, 24, 26–44.)

Plaintiff's experts have no evidence to dispute Mr. Davila's testimony about the manufacturing and inspection process for Mr. Gautney's pump, including its retainer ring. Plaintiff's retained regulatory expert, Dr. Stephen Amato, does not dispute that Mr. Gautney's pump underwent the standard manufacturing and inspection process Mr. Davila describes. (Ex. C, Amato Dep. at 126:11–22.) Indeed, Dr. Amato could not point to ***any*** specific requirement in the PMA for the 670G that Mr. Gautney's pump did not satisfy. (*Id.* at 98:9–18, 101:12–22.) With respect to the pump's retainer ring specifically, Plaintiff's product-design expert, Charles

Clemens, could not dispute Mr. Davila's testimony that the pump's retainer ring was defect-free when it left MiniMed's control and could offer no additional evidence of the retainer ring's condition at that time:

> "Q. Aside from what Medtronic has given you, you don't have any evidence that the crack in the retainer ring on Mr. Gautney's pump existed at the time it left Medtronic MiniMed's control, correct? A. ***I do not have evidence of what the retainer ring looked like, other than it was a brand-new retainer ring and it had passed Medtronic's visual inspection***."

(Ex. F, 7/19/23 Clemens Dep. at 156:7–15 (emphasis added).)

### B. Mr. Gautney was an experienced pump user whose 670G worked as designed in the month before his death.

Mr. Gautney was an experienced pump user who knew how to operate his 670G. Mr. Gautney began using an insulin pump in 2012, and began using the model 670G in 2018. (Ex. G, Goulden Report at 3.) MiniMed shipped Mr. Gautney the 670G at issue in this case on April 8, 2019. (Ex. E, Davila Decl. ¶ 20.)

Plaintiff, Mr. Gautney's daughter, testified that she believes her father "read the instructions for his insulin pumps" and "would have followed" those instructions, specifically the instructions "for using the pump and reservoir and infusion set." (Ex. H, Wiggins Dep. at 87:18–25, 93:9–12.) Plaintiff's medical expert, Dr. Goulden, similarly testified that Mr. Gautney "was a patient who showed up regularly and was committed" (Ex. I, 3/17/23 Goulden Dep. 118:6–14), that he "was given the

information . . . to be able to follow the appropriate instructions" (*id.* at 119:4–20), and that he understood how to properly fill a reservoir and place it in his insulin pump (*id.* at 120:18–121:9).

Mr. Gautney himself affirmed in writing that his 670G was working as of April 2020. In November 2019, in response to reported incidents of insulin reservoirs becoming loose due to detached or broken retainer rings, MiniMed voluntarily initiated a recall for the 670G pumps with clear retainer rings by sending a letter to customers advising them of the potential issue, steps to take, and providing for replacement pumps where needed.[1] (Ex. K, FDA, Class 1 Device Recall MiniMed 670G System with SmartGuard, *available at* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=178298; *see also* Ex. C, Amato Dep. at 177:11–15, 211:5–7.) On March 5, 2020, MiniMed issued another round of customer communications in connection with the November 2019 recall, again alerting pump users to the retainer ring issue and providing replacement

---

[1] "Recall" is an FDA term of art describing many types of field actions initiated by medical device manufacturers and does not necessarily mean that devices will be removed from use by patients. (Ex. J, FDA, "What is a Medical Device Recall?" September 26, 2018, *available at* https://www.fda.gov/medical-devices/medical-device-recalls/what-medical-device-recall.) Many courts have acknowledged that the mere fact of a "recall" of some units of a device does not create a presumption of a PMA violation. *Erickson v. Bos. Sci. Corp.*, 846 F. Supp. 2d 1085, 1093 (C.D. Cal. 2011) (collecting cases); *see also Leroy v. Medtronic, Inc.*, 2015 WL 4600880, at *8 (N.D. Fla. July 29, 2015) (voluntary recall "does not, as a matter of law, undermine the preemptive effect of the device's premarket approval").

pumps where needed. (Ex. L, Medtronic Recall Letter, March 5, 2020, *available at* https://www.medtronicdiabetes.com/res/img/notice12/US_Patient_Letter_MiniMe d_600_Series_Recall_February_2020.pdf.) On April 1, 2020, in response to a letter from MiniMed about the recall, Mr. Gautney signed and returned a form indicating that he had read the letter and that his pump was "fine right now." (Ex. M, MDT_Gauc0129820.)

Mr. Gautney regularly interacted with his pump on May 16–17, 2020. Mr. Gautney last replaced the reservoir in his pump on May 16 at 4:47 a.m. (Ex. N, Clemens Report at 12.) Over the next 27 hours, Mr. Gautney interacted with his pump several times, including seven separate, manually programmed insulin infusions. (*Id.* at 12–13.) Mr. Gautney last interacted with his pump at 7:31 a.m. on May 17, 2020. (*Id.* at 13.)

### C. Plaintiff's expert's unsupported theory is unrelated to her manufacturing-defect claims.

Plaintiff's Complaint alleges only manufacturing-defect claims. (Compl. ¶¶ 38–55 (asserting strict liability and negligence-based manufacturing-defect claims).) Specifically, Plaintiff alleges that "the subject MiniMed 670G insulin pump was defective and unreasonably dangerous in that the retainer ring failed to properly seat within the pump, causing an over-delivery of insulin, as experienced by Carlton Gautney on May 17, 2020." (*Id.* ¶ 41.)

The FDA-approved instructions for the 670G explain how to properly load a new insulin reservoir. Like all 670Gs, Mr. Gautney's device included a case housing electronics, a pumping mechanism, user interface, and insulin reservoir. (Ex. A, 670G SSED at 3.)



The 670G's reservoir (a separate and disposable device) can be removed when out of insulin, and the user then inserts a new reservoir according to the instructions in the FDA-approved User Guide. (Ex. O, 670G User Guide at 118.) When properly installing a new reservoir, the user first attaches the tubing connector of the infusion set, known as the "P-Cap," to the reservoir. (Ex. O, 670G User Guide at 122.) The infusion set is a separate disposable device that connects to the reservoir and contains

---

[2] (Ex. O, MiniMed 670G System User Guide, *available at* https://www.accessdata.fda.gov/cdrh_docs/pdf16/P160017S031C.pdf ("670G User Guide") at 35.)

a thin plastic tube that runs from the reservoir and is then inserted into the user's body. (*Id.* at 126–27.) Next, the user inserts the new reservoir into the case assembly and twists the P-Cap "a half-turn clockwise until the connector is locked." (*Id.* at 124.)

**To insert the reservoir into your pump:**

1. If you are using the pump for the first time, remove the shipping cap from the reservoir compartment.

2. Rewind your pump if you have not yet done so. See *Rewinding your pump, on page 118* for more information.

3. Insert the reservoir into the top of the reservoir compartment.

4. Turn the tubing connector approximately a half-turn clockwise until the connector is locked. The tubing connector should be aligned horizontally with the pump case as shown in the following example.



[3]

To create a watertight seal, the case includes a plastic retainer ring that is welded to the case at the point where the P-Cap (or "tubing connector," as labeled in the above illustration) is locked into place. (Ex. B, 3/9/23 Clemens Dep. at 39:15–40:12.) The User Guide warns 670G users not to "unscrew or retighten the tubing connector on

---

[3] (Ex. O, 670G User Guide at 124.)

the reservoir while the infusion set is connected to your body. Doing so could result in an accidental infusion of insulin." (Ex. O, 670G User Guide at 14.)

Plaintiff's only expert testimony in support of her claims that Mr. Gautney's pump "failed to properly seat within the pump, causing an over-delivery of insulin" comes from Mr. Clemens, Plaintiff's retained product-design expert. As described in more detail below, in the years following the event at issue Mr. Clemens tested Mr. Gautney's pump between 20 and 30 times, each time finding that the device operated properly and within specifications when used according to the FDA-approved instructions. (Ex. F, 7/19/23 Clemens Dep. at 137:6–23, 141:10–14, 151:8–12.)

Given the evidence that Mr. Gautney's pump could not malfunction when the reservoir was installed correctly, Mr. Clemens hypothesizes that Mr. Gautney installed the reservoir incorrectly—and contrary to the FDA-approved instructions for use. In his testing, Mr. Clemens noted that Mr. Gautney's pump "continue[d] to operate 'normally' despite not having a fully loaded/seated reservoir in place" (*i.e.*, the P-Cap was not turned the entire half-turn) and that when the user "proceeds to tighten the reservoir" (*i.e.*, completes the half-turn from the prior partial loading), the pump delivered an "undetected and unrecorded" infusion of "at least 4-5 units of insulin." (Ex. N, Clemens Report at 8.) Based on that testing, Mr. Clemens theorizes as follows: First, Mr. Clemens speculates that when Mr. Gautney changed the

14

reservoir on his pump for the last time on the morning of Saturday, May 16, 2020, Mr. Gautney inadvertently failed to fully tighten the P-Cap, resulting in a reservoir that was not fully seated. (Ex. B, 3/9/23 Clemens Dep. at 84:1–10.) The photograph below, which was included in Mr. Clemens's testing protocol, shows the P-Cap tightened to "75 – 80 percent of a complete load"—how Mr. Clemens imagines (without evidence) that Mr. Gautney tightened the P-Cap on May 16, 2020.



[4]

Mr. Clemens agreed that the photograph in his testing protocol did not follow the instructions in the 670G User Guide for correct installation of the P-Cap, as illustrated below. (Ex. F, 7/19/23 Clemens Dep. at 146:10–15.)

---

[4] (Ex. P, ClemensCo - 050823.)



Mr. Clemens then imagines that, on the morning of Sunday, May 17, 2020—more than 24 hours after partially installing the P-Cap—Mr. Gautney noticed that the P-Cap was not fully tightened, and at that point tightened it from a position of 75–80 percent to fully locked. (Ex. F, 7/19/23 Clemens Dep. at 171:22–172:12.) Mr. Clemens suggests that Mr. Gautney's belated tightening of the P-Cap caused him to receive an accidental infusion of insulin. (*Id.* at 171:22–172:12, 174:4–15.) Mr. Clemens believes that Mr. Gautney tightened the P-Cap while the pump was still connected to his body— again, contrary to the instructions in the FDA-approved User Guide. (Ex. B, 3/9/23 Clemens Dep. at 96:20–24; *see also* Ex. O, 670G User Guide at 14.) Of course, as Mr. Clemens acknowledged, if the pump was not connected to his body when the postulated insulin infusion occurred, "nothing would be infused." (Ex. F, 7/19/23 Clemens Dep. at 174:17–23.)

Although Mr. Gautney's pump kept records of its insulin deliveries and Mr. Gautney's interactions with the pump on May 16–17, 2020, Mr. Clemens does not

---

[5] (Ex. O, 670G User Guide at 124.)

rely on any of those records to support his theory. (*See* Ex. N, Clemens Report at 12–13; Ex. B, 3/9/23 Clemens Dep. at 92:14–19; 93:9–14.)

> **D.    Mr. Gautney's pump functioned properly in subsequent testing by both MiniMed and Plaintiff's expert.**

In the years following the event at issue, testing by both parties has confirmed that Mr. Gautney's pump functions properly when used according to the FDA-approved instructions. According to videos taken by Plaintiff's counsel, Mr. Gautney's pump was functioning and had an intact retainer ring on January 22, 2021. (Ex. Q, PL-Gautney-Wiggins 00942 (video of Mr. Gautney's pump taken by Plaintiff's counsel; *see also* Appendix A).) Since that time, Mr. Gautney's pump has been tested on three occasions: once by MiniMed in August 2022, and twice by Plaintiff's expert, once in December 2022 and again in May 2023. Each time, the retainer ring was not detached or broken and the pump at issue performed within specifications. Further, when the pump was prepared according to the FDA-approved instructions, the P-Cap and reservoir were able to lock into place, the P-Cap and reservoir were not loose, and the P-Cap and reservoir could be fully installed.

*First Post-Event Testing.* MiniMed tested Mr. Gautney's pump in August 2022, and determined that the pump was functioning properly. (Ex. B, 3/9/23 Clemens Dep. at 72:14–73:9 (testifying that MiniMed "found nothing wrong with the operation of the pump").) The pump passed all of MiniMed's functional testing,

including tests relating to the pump's ability to both accurately deliver insulin and stop delivering insulin based on certain sensor inputs. (Ex. R, MDT_Gauc0124759.) MiniMed noted a "crack" in the retainer ring at that time, but the retainer ring was not detached or broken, and the P-Cap could lock into place. (*Id.*) The retainer ring was also intact and not detached or broken in the January 2021 video taken by Plaintiff's counsel. *See* Appendix A (still photos captured from January 2021 video of Mr. Gautney's pump taken by Plaintiff's counsel).

*Second Post-Event Testing.* Plaintiff's expert Mr. Clemens tested Mr. Gautney's 670G four months after MiniMed, in December 2022, and confirmed that Mr. Gautney's pump functioned properly when the FDA-approved instructions were followed. (Ex. B, 3/9/23 Clemens Dep. at 99:9–11.) Mr. Clemens noted that the retainer ring in Mr. Gautney's pump was again still "intact" in December 2022. (Ex. B, 3/9/23 Clemens Dep. at 39:4–14.) When conducting his functional testing, Mr. Clemens followed the instructions in the FDA-approved user guide and instruction manual. (*Id.* at 21:21–22:3.) The user guide contains "pictures and instructions" indicating how to properly engage the P-Cap, (*id.* at 78:24–79:5), and according to Mr. Clemens the "P-cap could be fully engaged 100 percent" when following instructions in the user guide (*id.* at 40:13–41:3). Mr. Clemens testified that when the P-Cap in Mr. Gautney's pump was fully installed according to the FDA-approved instructions, the pump was "perfectly fine," "operating well," and

"operating quite accurately." (*Id.* at 72:14–73:9, 82:2–83:25; *see also id.* at 103:23–104:18 (agreeing that "the data shows that the pump operates as expected when it is 100 percent loaded properly").) Mr. Clemens also testified that the torque on the P-Cap for Mr. Gautney's pump was "within [MiniMed's] specification." (*Id.* at 73:10–17, 74:3–14; Ex. F, 7/19/23 Clemens Dep. at 178:23–179:2.) Even when the P-Cap was only partially engaged, the P-Cap did not become loose. (Ex. B, 3/9/23 Clemens Dep. at 79:20–80:11.) Finally, Mr. Clemens's testing showed that the pump's insulin delivery was accurate and "to spec." (*Id.* at 72:14–73:9.)

*Third Post-Event Testing.* Mr. Clemens again tested Mr. Gautney's 670G in May 2023, six months after his initial testing. (Ex. F, 7/19/23 Clemens Dep. at 145:18–23.) As with his earlier testing, Mr. Clemens noted that the retainer ring, although cracked, was completely intact and never loose or detached. (*Id.* at 149:11–14, 151:25–152:2.) He also noted that the P-Cap and reservoir could be threaded and fully installed. (*Id.* at 150:21–151:4.) Mr. Clemens's second round of functional testing yielded the same results as his first, and Mr. Gautney's pump—now three full years removed from the event at issue—continued to operate normally. (*Id.* at 141:10–14, 151:8–12.) In all of his testing, Mr. Clemens never assessed the weld between the pump case and the retainer ring—which is, of course, unsurprising given that the retainer ring for Mr. Gautney's pump was always intact, not loose, not

19

broken, and not detached. (*See* Ex. B, 3/9/23 Clemens Dep. at 62:13–15; Ex. F, 7/19/23 Clemens Dep. at 149:11–14, 151:20–152:2.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). As the non-moving party, Plaintiff "may not rest upon the mere allegations" in her Complaint, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

## ARGUMENT

All of Plaintiff's claims against MiniMed fail because they are expressly preempted by federal law (Part I). Plaintiff's claims also fail independently under Florida law (Part II). Regardless of whether Plaintiff's claims survive summary judgment, Plaintiff is not entitled to punitive damages (Part III).

I.     <u>All of Plaintiff's Claims are Preempted by Federal Law</u>

Plaintiff's claims, both of which are premised on a manufacturing-defect theory, are expressly preempted by federal law. As Plaintiff has admitted and MiniMed has proved, Mr. Gautney's MiniMed 670G insulin pump is a Class III, premarket-approved medical device. (Compl. ¶ 22; Ex. A, 670G SSED at 1.) "Any device that has received premarket approval . . . automatically satisfies" the first step of *Riegel*. *Leroy*, 2015 WL 4600880, at *7. Thus, Plaintiff's sole manufacturing-defect claims are expressly preempted to the extent the state laws they seek to enforce impose any requirements "different from, or in addition to" federal requirements. *Riegel*, 552 U.S. at 321–22.

Plaintiff's claims can survive federal preemption only if she threads the "narrow gap" of preemption and proves a parallel claim premised upon a violation of federal requirements. *Leroy*, 2015 WL 4600880, at *4 (quoting *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1204 (8th Cir. 2010)). Threading the "narrow gap" of preemption is "by necessity, a high burden." *Lowery v. Sanofi-Aventis LLC*, 535 F. Supp. 3d 1157, 1179 (N.D. Ala. 2021). To establish a parallel claim, a plaintiff must make a three-part showing. ***First***, she must "set forth evidence of *specific* violations of *specific* regulations."[6] *Id.* at 1180 (emphasis in

---

[6] Plaintiff's allegation that MiniMed manufactured 670G pumps "not in conformity with the current good manufacturing practice requirements of the Quality System regulation," (Compl. ¶ 24), is insufficient to establish a parallel claim. In support of her allegation, Plaintiff points to an FDA letter related to MiniMed's voluntary recall of pumps with clear retainer rings. (*Id.*; *see also* Ex. S, FDA, Medtronic, Inc.

original) (cleaned up) (citing *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1301 (11th Cir. 2011) and *Godelia v. Doe 1*, 881 F.3d 1309, 1319–20 (11th Cir. 2018)). **Second**, Plaintiff must show that MiniMed violated state-law requirements that are "genuinely equivalent" to federal requirements that the defendant also violated. *Lowery*, 535 F. Supp. 3d at 1181 (quoting *Wolicki-Gables*, 634 F.3d at 1300). **Third**, Plaintiff must "causally connect the simultaneous violations of federal and state law to the alleged injury." *Lowery*, 535 F. Supp. 3d at 1181 (quoting *Kubicki on behalf of Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 172 (D.D.C. 2018)). Given these requirements, Plaintiff must meet a "high bar" to prove her manufacturing-defect claim. *Lowery*, 535 F. Supp. 3d at 1181. Plaintiff cannot meet that high bar here.

### A. Plaintiff's claims are preempted because Mr. Gautney's pump was not manufactured in violation of a particular federal requirement.

Plaintiff's claim fails at the first step of the parallel-claim analysis, which asks whether Mr. Gautney's device was manufactured in violation of a "particular federal

---

Warning Letter, December 9, 2021, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/medtronic-inc-617539-12092021). But the issues identified by the recall and FDA's letter bear no causal relationship to the way Plaintiff's expert theorizes Mr. Gautney's pump malfunctioned. *See* Section I.B, *infra*. In any event, current good manufacturing practices ("CGMPs") and the Quality System Regulations ("QSR") are not device-specific federal requirements, and thus are insufficient to state a parallel claim. *See, e.g.*, *Horn v. Bos. Sci. Neuromodulation Corp.*, 2011 WL 3893812, at *9 (S.D. Ga. Aug. 26, 2011) (holding that "any claim based on QSRs or similarly vague FDA regulations" is expressly preempted).

specification." *Wolicki-Gables*, 634 F.3d at 1301. Plaintiff's retained regulatory expert ***admitted*** that he cannot point to any specific requirement in the PMA for the 670G that Mr. Gautney's pump did not satisfy.[7] (Ex. C, Amato Dep. at 126:11–22; *id.* at 98:9–18, 101:12–22.) And MiniMed's manufacturing records for Mr. Gautney's 670G conclusively establish that his device was manufactured in compliance with its FDA-approved specifications and was free of any manufacturing defects when MiniMed released it for sale. (Ex. E, Davila Decl. ¶¶ 21, 45 (referring to MiniMed's traceability records for Mr. Gautney's specific 670G, which passed a series of quality-assurance tests designed to ensure its compliance with PMA requirements).)

The competent, undisputed evidence thus shows that Mr. Gautney's 670G complied with its PMA manufacturing requirements upon leaving MiniMed's control in 2019. When presented with similar evidence, courts nationwide have

---

[7] Plaintiff's regulatory expert, Dr. Amato, only criticized MiniMed's selection of material for the retainer ring. (*See* Ex. C, Amato Dep. at 92:12–21, 128:25–129:14.) In other words, he took issue with the ***design*** of the retainer ring. But critically, both Dr. Amato and Mr. Clemens—Plaintiff's retained product-design expert—admitted that the material used for the retainer ring in Mr. Gautney's pump was ***as specified in the 670G PMA application***, which the FDA approved. (*See* Ex. B, 3/9/23 Clemens Dep. at 42:23–43:6; Ex. C, Amato Dep. at 92:23–93:2.) To the extent Plaintiff claims MiniMed should have used a different material for the retainer ring, that claim is preempted because it seeks to impose design requirements "different from, or in addition to" federal requirements. 21 U.S.C. § 360k(a); *see also Wolicki-Gables*, 634 F.3d at 1302 (common-law design-defect claims against Class III medical devices are preempted).

entered summary judgment for Medtronic and other medical-device manufacturers. *See, e.g.*, *Bledsoe v. Medtronic, Inc.*, 635 F. Supp. 3d 654, 661 (N.D. Ind. 2022) (granting summary judgment on manufacturing-defect claims where manufacturing records established Class III medical device at issue was manufactured according to specifications); *Carter v. Medtronic, Inc.*, 2020 WL 2319729, at *5–6 (S.D. Ohio May 11, 2020) (same); *Duran v. Miller, M.D.*, 2017 WL 3254989, at *1–2 (Cal. Super. Ct. July 26, 2017) (same); *Bentzley v. Medtronic, Inc.*, 827 F. Supp. 2d 443, 455–56 (E.D. Pa. 2011) (same); *Loomis v. Medtronic, Inc.*, 2005 WL 1828763, at *4–5 (N.D. Ohio Aug. 1, 2005) (same).

Plaintiff's expert suggests that the mere fact that Mr. Gautney had hypoglycemia before his death is evidence that his 670G delivered excessive insulin, and that this purported malfunction is evidence of a defect. Even assuming Mr. Gautney's device delivered an accidental infusion of insulin (a fact that MiniMed disputes but is not necessary to deciding this motion), that would not create a fact issue to defeat summary judgment. Courts nationwide have rejected attempts to circumvent federal preemption based on theories like Plaintiff's that a device must have a defect solely because it malfunctioned. Courts reject this kind of *res ipsa* theory because the FDA approves Class III devices ***despite*** knowing that they may potentially malfunction, and may therefore "present[] a potential unreasonable risk of illness or injury." *Riegel*, 552 U.S. at 317 (quoting 21 U.S.C. § 360c(a)(1)(C)(ii)).

"Much like the concept of *res ipsa loquitur*, the inference of defect requires showing more than a scintilla of evidence that the device malfunctioned and that the malfunction was likely caused by a defect in the device's design or manufacture." *Wolicki-Gables*, 634 F.3d at 1302 (cleaned up). Rather, "for a state law claim to survive express preemption under the MDA, a plaintiff must show that the defendant deviated from a particular pre-market approval or other FDA requirement applicable to the Class III medical device." *Weber v. Allergan, Inc.*, 940 F.3d 1106, 1112 (9th Cir. 2019); *see also, e.g.*, *Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 531 (S.D. Tex. 2009) (the doctrine of *res ipsa* has been "soundly refuted by *Riegel*" for Class III devices), *aff'd*, 631 F.3d 777 (5th Cir. 2011); *Walker v. Medtronic, Inc.*, 670 F.3d 569, 580 (4th Cir. 2012) (noting the FDA's recognition, via the PMA process, that a Class III medical device's "safety and reliability cannot be guaranteed indefinitely in the 'extremely hostile environment of the human body'").

Indeed, when the FDA granted PMA for the 670G, it accounted for the specific type of device malfunction Plaintiff's expert speculates occurred here. The FDA stated when it approved the 670G that it was ***specifically aware*** that "there is an inherent risk that users of the device who do not use the 670G device as intended could harm themselves," of the "theoretical risk of insulin over-delivery due to device malfunction," and the resulting risk of "severe hypoglycemia." (Ex. A, 670G SSED at 13.) It nevertheless found that the benefits of the 670G outweighed its

potential risks. Absent a showing that MiniMed violated a particular federal specification in its manufacturing process—which Plaintiff has not made—her expert's speculative theory cannot defeat federal preemption. *Wolicki-Gables*, 634 F.3d at 1301.

## B. Plaintiff's claims are also preempted because she cannot show a causal link between a particular violation of federal requirements and Mr. Gautney's death.

Even if Plaintiff could point to a specific federal requirement that was violated in the manufacture of Mr. Gautney's 670G (and she cannot), she still could not show the required causal link between the alleged violation and Mr. Gautney's death. *See Lowery*, 535 F. Supp. 3d at 1181 (plaintiff alleging parallel claim must "causally connect the simultaneous violations of federal and state law to the alleged injury"). The only defect Plaintiff alleges in Mr. Gautney's pump is a "crack" in the retainer ring first observed in August 2022. But Plaintiff's own expert admits that the retainer ring on Mr. Gautney's pump was attached and "intact" during his testing in December 2022 and May 2023—several years after the event. (*See* Ex. B, 3/9/23 Clemens Dep. at 39:4–14; Ex. F, 7/19/23 Clemens Dep. at 149:11–14, 151:25–152:2.) Indeed, Plaintiff has no evidence that the retainer ring on Mr. Gautney's pump has *ever* been detached. (Ex. F, 7/19/23 Clemens Dep. at 150:2–11.) Mr. Gautney himself affirmed that his pump was working "fine" the month prior to the

event, and, in subsequent testing by both MiniMed and Plaintiff's expert, the pump worked perfectly when the P-Cap was loaded according to the FDA-approved instructions. (*See* Ex. M, MDT_Gauc0129820; Ex. B, 3/9/23 Clemens Dep. at 72:14–73:9, 82:2–83:25, 103:23–104:18; Ex. F, 7/19/23 Clemens Dep. at 141:10–14, 151:8–12.) Each and every time Mr. Gautney's pump was tested, the P-Cap could be locked into place. (*See* Ex. R, MDT_Gauc0124759; Ex. B, 3/9/23 Clemens Dep. at 40:18–22 ("Q. But you did confirm, as part of your testing you did of Mr. Gautney's pump, that the P-cap could be fully engaged 100 percent; is that correct? A. That is correct."); *see also* Ex. F, 7/19/23 Clemens Dep. at 150:21–151:1.) In other words, the alleged "crack" in the retainer ring had no effect on the pump's function, including the function of the P-Cap.

Even accepting Plaintiff's expert's theory that Mr. Gautney's device delivered an accidental insulin infusion, Plaintiff cannot link that alleged infusion to the pump's attached, intact, and functional retainer ring. Plaintiff's expert's only explanation for an accidental infusion of insulin is his theory that ***Mr. Gautney himself*** turned the P-Cap while the pump was attached to his body. (*See* Ex. B, 3/9/23 Clemens Dep. at 96:20–24; Ex. F, 7/19/23 Clemens Dep. at 174:17–23.) If Plaintiff's expert's speculation is correct, the theoretical infusion was proximately

27

caused by ***Mr. Gautney's own actions***, not by any defect in his device.[8] Indeed, Plaintiff's expert testified that Mr. Gautney "either turned [the P-Cap] or it become fully loaded through his actions," and that he would not have received excess insulin but for those actions. (*Id.* at 174:4–23.)

*     *     *

In short, even if Plaintiff could present competent evidence creating a factual dispute regarding whether Mr. Gautney's pump malfunctioned (and she cannot), that still would not be enough to defeat summary judgment. Plaintiff has the burden to present evidence that the pump malfunctioned due to a ***manufacturing defect*** caused by a ***deviation*** from PMA requirements, and that this manufacturing defect caused Mr. Gautney's death. Plaintiff's theory of what caused Mr. Gautney's death—a combination of user error and design defect—is completely disconnected from any alleged manufacturing defect, let alone a manufacturing defect caused by a deviation

---

[8] Plaintiff's expert has suggested that Mr. Gautney may have neglected to fully engage the P-Cap when he first inserted the reservoir because of excess friction or torque on the P-Cap, leading Mr. Gautney to believe the P-Cap was fully engaged when it was not. (*See, e.g.*, Ex. F, 7/19/23 Clemens Dep. at 209:3–18.) But Mr. Clemens measured the torque on Mr. Gautney's pump as part of his testing and found it to be within the FDA-approved PMA specifications. (*See* Ex. B, 3/9/23 Clemens Dep. at 73:10–17, 74:3–14; Ex. F, 7/19/23 Clemens Dep. at 178:23–2.) To the extent Plaintiff suggests the P-Cap torque specifications should have been different from those the FDA approved, her claims are preempted because they seek requirements "different from, or in addition to" federal requirements. 21 U.S.C. § 360k(a).

from PMA requirements. As a result, MiniMed is entitled to summary judgment on Plaintiff's claims.

## II. Plaintiff's Manufacturing-Defect Claims Independently Fail Under Florida Law

Even if Plaintiff's manufacturing-defect claims were not preempted (and they are), they independently fail under Florida law. "Under Florida law, a manufacturing defect requires (1) a product that 'does not conform to its intended design' such that it (2) 'fails to perform as safely as the intended design would have performed.'" *Citizens Prop. Ins. Corp. v. Simkar LLC*, 813 F. Supp. 2d 1356, 1363 (M.D. Fla. 2011) (quoting Fla. Std. Jury Instr. (Civil) PL 4). Further, "[t]o prove a manufacturing defect claim under Florida law, a plaintiff must prove that 1) the product was defective, 2) the defect existed at the time the product left the defendant-manufacturer's control, and 3) the defect proximately caused the plaintiff's injuries." *Salinero v. Johnson & Johnson*, 400 F. Supp. 3d 1334, 1343–44 (S.D. Fla. 2019), *aff'd*, 995 F.3d 959 (11th Cir. 2021).

Plaintiff cannot prove that Mr. Gautney's pump had a manufacturing defect at any time under Florida law, let alone a defect that existed at the time the pump left MiniMed's control in 2019 or one that proximately caused Mr. Gautney's death. Mr. Gautney's device was free of manufacturing defects and conformed to its intended design when it left MiniMed's control in April 2019. (Ex. E, Davila Decl. ¶¶ 20, 21, 45.) Mr. Gautney's pump "met all of Medtronic's FDA PMA-approved

specifications, passed each quality assurance inspection and test, and was free from any manufacturing defect at the time it was released for sale." (*Id.* ¶ 21.) Further, Plaintiff's regulatory expert, Dr. Amato, was unable to point to a specific requirement in the PMA for the 670G that Mr. Gautney's pump did not meet. (Ex. C, Amato Dep. at 98:9–18; 101:12–22.) Even after Mr. Gautney's pump left MiniMed's control, his pump performed as intended, both before and after his death. First, Mr. Gautney himself affirmed that the pump was working "fine" in April 2020. (Ex. M, MDT_Gauc0129820.) Next, Mr. Gautney's pump functioned within specifications when MiniMed performed testing in August 2022.[9] (Ex. R, MDT_Gauc0124759; *see also* Ex. B, 3/9/23 Clemens Dep. at 72:14–73:9.) And, finally, the pump functioned as intended and within specifications when Plaintiff's expert, Mr. Clemens, tested it in December 2022 and May 2023. (*See* Ex. B, 3/9/23 Clemens Dep. at 72:14–73:9, 82:2–83:25, 103:23–104:18; Ex. F, 7/19/23 Clemens Dep. at 141:10–14, 151:8–12.)

Plaintiff's expert's theory that Mr. Gautney's pump malfunctioned by delivering insulin after Mr. Gautney tightened the P-Cap while his pump was attached to his body is, again, not evidence of a manufacturing defect. At most, Mr. Clemens has theorized an alleged design defect. This is because the pump's ability

---

[9] The "crack" MiniMed identified in the retainer ring of Mr. Gautney's pump did not affect its function. (Ex. R, MDT_Gauc0124759; *see also* Ex. B, 3/9/23 Clemens Dep. at 72:14–73:9.)

to deliver insulin despite a partially loaded P-Cap is a feature that exists in **all** pumps, not just Mr. Gautney's. Mr. Clemens himself acknowledged that the 670G's ability to function with a partially loaded P-Cap is a design issue, and further admitted that a partially loaded P-Cap can occur on **any** pump, including the 670G, regardless of the materials or welding process used for the retainer ring. (*Id.* at 177:19–178:9; 180:18–181:10). By definition, a design defect occurs throughout "an entire line of products," whereas a manufacturing defect is "aberrational." *Salinero*, 400 F. Supp. 3d at 1344 (S.D. Fla. 2019) (citing *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989)). Plaintiff has not asserted a claim for design defect. If she had, that claim, like her manufacturing-defect claim, would be preempted under *Riegel. See Wolicki-Gables*, 634 F.3d at 1302.

Plaintiff also cannot prove that a manufacturing defect proximately caused Mr. Gautney's death. As explained above, Plaintiff has no evidence establishing a causal link between the allegedly defective retainer ring—which was functioning properly and was intact and affixed to Mr. Gautney's pump before and after his death—and the accidental infusion of insulin her expert speculates caused a hypoglycemic event.[10] *See* Section I.B, *supra*. Instead, as Plaintiff's expert admits,

---

[10] Plaintiff's expert's theory is not just speculative and lacking in record support. It is also highly implausible. The user guide for the 670G explains how to properly load a new reservoir, and explicitly directs patients **not** to tighten the P-cap when the pump is attached to their body. (Ex. O, 670G User Guide at 14, 123–24.) Mr. Gautney was an experienced pump user, and Plaintiff and her experts agree that Mr.

the pump's purported malfunction and resulting excess insulin ***could not have***

***occurred*** but for Mr. Gautney's own actions. (Ex. F, 7/19/23 Clemens Dep. at 174:6–

23.)

Plaintiff thus cannot prove her manufacturing-defect claims under Florida

law, and MiniMed is entitled to summary judgment on all claims for this independent

reason.

### III.    Plaintiff Is Not Entitled to Punitive Damages

Plaintiff is not entitled to punitive damages under Florida law. Florida's

conflict-of-laws principles dictate that Florida law applies unless there is a true

conflict between Florida law and the laws of the other interested states. *Pycsa*

*Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1219 (S.D. Fla.

2008), *aff'd*, 329 F. App'x 257 (11th Cir. 2009) Plaintiff is not entitled to punitive

---

Gautney would have followed the instructions in the user guide when operating his
pump. (*See* Ex. H, Wiggins Dep. at 87:18–25, 93:9–12; Ex. I, 3/17/23 Goulden Dep.
118:6–14, 119:4–20, 120:18–121:9.) Mr. Gautney interacted with his pump multiple
times between his last reservoir insertion on May 16 and his death on May 17. (Ex.
N, Clemens Report at 12–13.) Plaintiff's expert therefore draws multiple implausible
inferences in speculating that Mr. Gautney: (1) failed to fully engage the P-cap on
May 16, despite being an experienced pump user; (2) failed to notice that the P-Cap
was not fully engaged multiple times over the course of 27 hours; and (3) finally
noticed and fully tightened the P-Cap on his last interaction with the pump, contrary
to the explicit instructions in the device user guide. Again, there is no reliable
evidence supporting this alleged chain of events.

damages under any interested state's law, [11] so MiniMed assumes for the purposes of this motion that Florida law applies to her request for punitive damages.

As a threshold matter, Florida law does not allow punitive damages where the underlying cause of action fails. *Ault v. Lohr*, 538 So. 2d 454, 456 (Fla. 1989) (an award of punitive damages under Florida law requires a finding of a breach of duty). Because Plaintiff's claims are preempted and independently fail under state law, her request for punitive damages also fails under Florida law. *See* Sections I and II, *supra*.

Were Plaintiff's claims to survive (and they should not), Plaintiff still cannot prove by "clear and convincing evidence" that MiniMed engaged in "intentional misconduct or gross negligence"[12] as required for an award of punitive damages. Fla. Stat. Ann. § 768.72(2). "Clear and convincing evidence is an 'intermediate level of proof' that requires "credible" evidence." *Nunez v. Coloplast Corp.*, 461 F. Supp.

---

[11] California may have an interest in this case, but the outcome under California law and Florida law is the same: California law bars punitive damages in wrongful death actions, so Plaintiff is not entitled to punitive damages under either Florida or California law. *See* Cal. Civ. Proc. Code § 377.61.

[12] "'Intentional misconduct' means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." Fla. Stat. Ann. § 768.72(2)(a). "'Gross negligence' means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. Ann. § 768.72(2)(b).

3d 1260, 1268 (S.D. Fla. 2020) (citation omitted). Plaintiff cannot meet that high burden. She cannot establish that MiniMed engaged in intentional misconduct or gross negligence with respect to Mr. Gautney's pump, which was functioning properly and as designed both before and after his death. Indeed, as explained above, Plaintiff cannot even establish a causal connection between Mr. Gautney's death and MiniMed's alleged misconduct because the alleged defect—a crack in the pump's retainer ring—had no effect on the pump's function, including the function of the P-Cap. *See id.* at 1269 (granting summary judgment on plaintiff's claim for punitive damages under Florida law where the court "fail[ed] to see the connection" between internal documents cited by plaintiff and the plaintiff's injury); *see also* Section I.A, fn 6, *supra*.

Accordingly, Plaintiff is not entitled to punitive damages as a matter of law.

## CONCLUSION

MiniMed respectfully requests that the Court grant summary judgment on both of Plaintiff's claims.


Dated: September 12, 2023              **GREENBERG TRAURIG, P.A.**

*s/Nicole E. Narotzky*
John K. Londot, Esq.
Florida Bar No. 579521
GREENBERG TRAURIG LLP
101 E College Ave.
Tallahassee, FL  32301

Telephone: (850) 222-6891
Facsimile: (850) 681-0207
Email:  londotj@gtlaw.com

Nicole E. Narotzky, Esq. (admitted *pro hac vice*)
Thomas R. Pack, Esq. (admitted *pro hac vice*)
Ann E. Motl, Esq. (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN  55402
Telephone: (612) 259-9751
Fax: (612) 677-3101
Email:  narotzkyn@gtlaw.com
packt@gtlaw.com
ann.motl@gtlaw.com

and
Rodney M. Hudson, Esq. (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
101 Second Street, Suite #2200
San Francisco, CA  94105-3668
Telephone: (415) 655-1317
Email:  hudsonr@gtlaw.com

*Counsel for Defendant*
*Medtronic MiniMed, Inc.*

## WORD COUNT CERTIFICATION

In accordance with Northern District of Florida Local Rules 7.1(F), 56.1(B), and 56.1(E), the undersigned certifies that the memorandum above contains 7,989 words.

s/ *Nicole Narotzky*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ *DRAFT*

The images below were captured from a video of Mr. Gautney's 670G taken by Plaintiff's counsel in January 2021. (Ex. Q, PL-Gautney-Wiggins 00942.)



