## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CARLA WIGGINS, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF CARLTON D. GAUTNEY, JR.,

       Plaintiff,

v.

MEDTRONIC MINIMED, INC.,

       Defendant.

Case No. 3:22-cv-02781-MCR-EMT

## DEFENDANT MEDTRONIC MINIMED, INC.'S CLOSING ARGUMENT IN SUPPORT OF ITS MOTIONS TO EXCLUDE MR. CHARLES CLEMENS, DR. PETER GOULDEN, AND DR. WILLIAM ANDERSON

Rule 702 demands that Plaintiff demonstrate that her experts' opinions are (1) "based on sufficient facts or data," (2) "the product of reliable principles and methods," and (3) reflect "a reliable application" of those principles and methods. Fed. R. Evid. 702. Plaintiff's experts fail all three steps. Focusing specifically on Mr. Clemens, he does not clear Rule 702's bar for at least three reasons.

***First***, Mr. Clemens's theory is not based on sufficient facts or data as required by Rule 702(b); indeed, it is not based on facts or data in this case at all. When test after test confirmed Mr. Gautney's pump passed all objective specifications and delivered insulin accurately if used in a manner consistent with the User Guide and in accordance with Mr. Gautney's programming, Mr. Clemens reverse engineered a speculative hypothetical scenario based on multiple unfounded assumptions:

- Mr. Clemens first surmises that Mr. Gautney under-rotated his P-cap on May 16, 2020 (contrary to the User Guide) but lacks any facts and cited no evidence from the pump or any witness that Mr. Gautney, an experienced 8-year pump user, improperly installed his reservoir on that or any other occasion;

- Mr. Clemens has no explanation for how Mr. Gautney did not notice an improperly installed reservoir despite interacting with the pump numerous times after installing a new reservoir, including seven separate, manually programmed insulin infusions between May 16 and May 17, 2020;

- Mr. Clemens then assumes that on the morning of May 17, 2020, Mr. Gautney either noticed an under-rotated P-cap and intentionally fully installed it while the infusion set was connected to his body (again contrary to the User Guide) or that "by his own actions," the P-cap inadvertently turned into place;

- Mr. Clemens's hypothetical cannot account for why the reservoir did not then properly seat while Mr. Gautney was riding his motorcycle from Alabama to

Destin, eating at a restaurant, coming and going from his hotel, or at any other time during the intervening 24 plus hours; and

- Mr. Clemens's testimony at the hearing further confirmed his lack of factual support for his theory and ensuing speculation, when he offered his own conflicting facts—first that he "felt" resistance when installing the P-cap (contrary to the scientific torque testing) but later claiming the P-cap could have become fully engaged on accident because "***it doesn't take a whole lot of, you know, motion on that connector to fully load it.***" (4/15/24 Evid. Hearing Tr. ("Hearing Tr.") at 106:16–107:2) (emphasis added).)

Mr. Clemens's opinions are not based on "sufficient facts or data" in this case; they are based on unfounded and unsupportable assumptions about a grossly speculative hypothetical scenario that does not pass muster under Rule 702(b).

***Second***, Mr. Clemens's hypothetical scenario is not the product of reliable scientific principles or methods as required by Rule 702(c) and (d). Mr. Clemens confirmed that Medtronic MiniMed's 670G insulin pumps (like Mr. Gautney's) undergo objective, scientifically recognized tests that are relevant to his opinions, including: (1) torque testing, which measures the force required to install the P-cap; and (2) pull testing, which measures the strength of the weld of the retainer ring to the case assembly. (Hearing Tr. at 89:17–91:19.) But when the retainer ring on Mr. Gautney's pump was firmly affixed to the pump and met its specifications during Mr. Clemens' own torque testing, Mr. Clemens did not conduct any pull testing. In fact, he testified that testing the weld strength of the retainer ring to the case through actual scientific testing was suddenly "not relevant" to his conclusion that Mr. Gautney's 670G pump suffered from a "weak weld." (*Id.* at 92:8–11.) Instead, Mr.

Clemens reverse engineered a subjective and unscientific theory of some unknown and undefined resistance he "felt" when inserting the P-cap. Mr. Clemens's hypothetical scenario is based on his unscientific, personally subjective "feel" that (*without looking, as users must do*) he thought that the P-cap was fully installed because of an alleged unmeasured resistance he claims to have "felt" during his rotation of the P-cap. But based on the science, Mr. Gautney's pump met the measured torque specifications, and Mr. Clemens confirmed that he did not test any other pumps, and therefore has no basis to even evaluate his own "feel" test. Mr. Clemens's made-up "feel" test is not grounded in science or based on any measurement of force,[1] and fails to meet the requirements of Rule 702(c) and (d).

*Third*, Mr. Clemens's hypothetical situation is completely divorced from Plaintiff's manufacturing defect claim, so it does not fit the facts of the case. Although Mr. Clemens blames a "weak weld" for a crack he observed in Mr. Gautney's retainer ring, that is a critique of the FDA-approved materials used to build Mr. Gautney's 670G pump, which is quintessentially part of the pump's design. (Mot'n for Summ. J. Mem., ECF No. 64, at 23.) As Medtronic later determined, using two similar, but different types of plastic materials for the case

---

[1] Mr. Clemens's claimed subjective "feel" test of ***excessive resistance*** in turning the P-cap is both inconsistent with the undisputed factual compliance with the pump's specifications (*i.e.*, the confirmed objective measurements of the torque force), but also his own testimony that apparently "***it doesn't take a whole lot***" of motion to fully load the P-cap. (Hearing Tr. at 106:16–107:2 (emphasis added).)

assembly and the retainer ring resulted in a weld between the retainer ring and the case assembly that had "non ideal strength." *See* (Pltf. Ex. 3 at 1-5.) Because Mr. Clemens's hypothetical scenario—even if it were admissible as expert opinion, which it is not—does not relate to the legal claim of manufacturing defect at issue in this case, Mr. Clemens's opinions separately do not "fit" the facts of this case and should be excluded.

Furthermore, and recognizing that Mr. Clemens's hypothetical is not actually related to the manufacturing of the pump, at the April hearing and for the first time in this case, Mr. Clemens attempted to close the chasm between his hypothetical scenario related to the retainer ring (which amounts to a preempted attack on the FDA-approved design) and Plaintiff's pleaded manufacturing defect claim. Through his testimony, Mr. Clemens tried to retroactively bolster his speculative theory by selectively displaying cherry-picked snippets of documents to suggest that the findings of three other sources—Medtronic's own internal investigation, as well as the observations from both the FDA and third-party consultant Greenleaf Health— are "consistent with" his manufacturing defect theory. Not so. A simple inspection of the documents shows that Mr. Clemens took fantastic liberties with them.

To start, none of the documents Plaintiff or Mr. Clemens cited even posit a theory, let alone conclude, that a crack in a retainer ring that is affixed to the case can make a user "feel" like a P-cap is "fully loaded" when it is not. To the contrary,

Medtronic determined the theoretical risk for "untimely rapid insulin infusion" presented if, and only if, "the reservoir is loose or able to freely detach from the pump reservoir compartment." *Compare* (Clemens Slide 26 (screenshotting Pltf. Ex. 38)) *with* (Pltf. Ex. 38 at 13.) Of course, it is undisputed that Mr. Gautney's reservoir was never loose or ever able to freely detach from the reservoir compartment. Indeed, Mr. Clemens expressly disclaimed such a finding. (Hearing Tr. at 86:1–5 ("obviously my opinion [] is that the damage to the retainer ring causes the P-cap not to be fully loaded, not that the retainer ring is loose or comes detached.").)

Further, Medtronic's "root cause" analysis determined that the risk of damage to the retainer ring was caused by the materials chosen for the FDA-approved design of the 670G. *See* (Pltf. Ex. 4 at 5.) As referenced above, because the plastic material chosen for the pump case assembly (PC/ABS) was different from the plastic material chosen for the retainer ring (PC), the resulting weld between the two was of "non ideal strength" and retainer ring could come loose or detach from the pump. (Pltf. Ex. 3 at 1-5.) This identified issue was ultimately addressed by the re-designed 670G pump, which used the same plastic material (PC/ABS) for retainer ring and the case assembly. *See* (*Id.* at 1–4 to 1–6.) And, rather than somehow supporting Mr. Clemens's hypothesis, FDA and Greenleaf both agreed with Medtronic's analysis. *See* (Pltf. Ex. 11 at 1; Pltf. Ex. 12 at 2, 7; Pltf. Ex. 18 at 11; *see also* Appendix A (outlining the findings in Plaintiff's exhibits that the design of the 600 series NGP

pumps, and in particular its material selection, was the "primary technical cause" of complaints related to the retainer ring).[2])

In short, Mr. Clemens's speculative theory stands in splendid isolation—it does not utilize sufficient facts, does not use an accepted methodology or objective standards, does not fit the facts of this case, and is in no way "consistent with" the documented findings or observations of Medtronic, FDA, or Greenleaf.

\* \* \*

Finally, Mr. Clemens's opinions are the foundation of Plaintiff's case. Without them, Plaintiff lacks the requisite expert testimony linking Mr. Gautney's unfortunate death to any alleged pump malfunction or defect. Because Dr. Goulden explicitly disclaims any knowledge or opinion related to Mr. Gautney's pump in order to rely on Mr. Clemens to "rule in" pump malfunction, his opinion should also be excluded. And, Dr. Anderson's opinion that there is no way to give an opinion to a reasonable degree of medical certainty regarding the cause of Mr. Gautney's death is not only directly contrary to Mr. Goulden's opinion, but is actually not helpful to a jury, so his testimony should be excluded as well.

## I.    Mr. Clemens's Opinions Are Inadmissible Under Rule 702

---

[2] Pursuant to ECF No. 122, Medtronic will file a motion to seal certain of Plaintiff's and Medtronic's exhibits admitted at the Evidentiary Hearing by May 17, 2024.  Some of those exhibits are referenced in this brief and accompanying appendix, and such materials will be included in Medtronic's forthcoming motion to seal.

The Rule 702 inquiry considers whether: (1) the expert is qualified; (2) "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*"; and (3) "the testimony assists the trier of fact." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (Rodgers, J.), *aff'd sub nom.*, 609 F.3d 1183 (11th Cir. 2010).[3] Of these considerations, Medtronic focuses its argument on Mr. Clemens's speculative theories, failure to apply scientific principles or a reliable methodology in reaching his ultimate conclusions, and on the fact that Mr. Clemens's theory does not fit the facts of this case and would be unhelpful to the jury.

A.      **Mr. Clemens's theory is based on pure speculation.**

Mr. Clemens's theory requires that this Court entertain a series of hypotheticals and assumptions that lack any factual basis. But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997). In the Eleventh Circuit, the Court must "undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's

---

[3] Rule 702 was amended last year to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 Adv. Comm. Note to 2023 Amendment.

entire opinion must be excluded." *Hendrix*, 255 F.R.D. at 578. "[T]o be reliable the expert's testimony must always be based on 'good grounds'" and "'*[l]eaps of faith*' unsupported by good science *preclude the admission of expert testimony*." *Id.* at 579 (emphasis added) (quoting *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002)). Here, each step in Mr. Clemens's analysis requires "a large analytical leap… between the facts and the opinion." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

First, Mr. Clemens hypothesizes that Mr. Gautney did not visually confirm his P-cap was fully installed the morning of May 16, 2020, but instead only "felt" that his reservoir was locked in place. *See* (Hearing Tr. at 70:19–20 ("I believe Mr. Gautney just felt that he had loaded his instrument and all was well").) This is, of course, not only contrary to the User Guide[4], but contrary to the sworn testimony of Dr. Goulden at the April hearing where Dr. Goulden confirmed "that placing a new reservoir and infusion set *requires that you look at your pump* and interact with your pump." (*Id.* at 164:16–20 (emphasis added).)

Mr. Clemens further stacks an additional assumption that either Mr. Gautney intentionally fully engaged the P-cap while the infusion set was connected to his body on the morning of May 17, 2020 (which would also violate the User Guide's

---

[4] *See* (Mot'n for Summ. J. Mem., ECF No. 64, at 13 (citing Ex. O).)

warnings and instructions) or "by his actions" the P-cap became fully engaged through some unknown force or action that morning. (*Id.* at 70:21–71:3.)

But Mr. Clemens lacks sufficient facts or good grounds for these "leaps of faith." Not only is there no evidence in the pump data of this hypothetical on the day at issue, but Mr. Clemens admitted that he is unaware of any evidence that this hypothetical ever occurred in the past, during the at least 8 years of regular infusion set changes Mr. Gautney made. (*Id.* at 143:20–144:7; 164:14–25.) Further, Mr. Clemens's hypothetical timing of the full installation of the P-cap on the morning of March 17 must also ignore the actual, documented facts of the series of pump interactions (which included seven manually programmed insulin infusions) Mr. Gautney unquestionably had after inserting his new reservoir on May 16. (Pltf. Ex. 1 at 12–13.) Again, the hypothetical situation presupposes Mr. Gautney repeatedly interacted with his pump without ever noticing that the P-cap was not fully installed, and asks this Court to assume the same.

Mr. Clemens's rank speculation reached a crescendo during the April hearing when the Court questioned Mr. Clemens regarding what unintentional "actions" could have overcome the resistance and caused the P-cap to be fully installed while the infusion set was attached to Mr. Gautney's body. Despite Mr. Clemens hypothesis that the P-cap stopped short of full installation because it met a resistant force, he quickly gave a different story and announced: "you know, it doesn't take a

whole lot of, you know, motion on that connector to fully load it." (Hearing Tr. at 106:16–107:2.) That new conjecture was not only inconsistent with his personal, subjective "feel" test, but it also necessarily ignores all record evidence that renders it particularly implausible under the actual facts of the case. Mr. Clemens cannot have it both ways, offering different versions of what his subjective "feel" test says about P-cap resistance when convenient for his speculative theory. If it "doesn't take a whole lot of [] motion on that connector to fully load it," why was Mr. Gautney unable to load his reservoir properly when he initially changed his reservoir? Why didn't Mr. Gautney's actions "fully load it" while he was riding a motorcycle from Alabama to Destin, Florida? Why didn't Mr. Gautney's actions of eating lunch at a restaurant, ordering and eating dinner, coming and leaving his hotel room numerous times, or any myriad of other activities not "fully load it" at some earlier time?

Here is why: Mr. Clemens worked backwards not forwards. Mr. Clemens started with the preconceived conclusion that something went wrong with the pump. And then, ignoring the actual facts and without sufficient facts of his own, he conjured up a hypothetical scenario where he claims it could have happened. That is not reliable: "Opinions that assume a conclusion and reverse-engineer a theory to fit that conclusion are . . . inadmissible." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) (internal quotation marks and brackets omitted). Rule 702 demands more. *See McDowell*, 392

F.3d at 1300 (an "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions.").

**B.   Mr. Clemens's methodology is not reliable.**

In addition to being built on layers of speculation, Mr. Clemens personal and subjective "feel" test is itself not reliable under Rule 702 rigor. In his testimony, Mr. Clemens discussed two objective, FDA-approved specifications related to the retainer ring: the strength of the weld (which is able to be tested with a pull test), and the force needed to turn/install the P-cap (which is able to be tested with torque test). (Hearing Tr. at 89:17–91:19.) While Mr. Clemens confirmed that the force to install the reservoir into Mr. Gautney's pump met its specifications, Mr. Clemens went on to testify that the strength of the weld between the retainer ring and the pump case was interestingly "not relevant to his theory or opinions" (presumably because the retainer ring remained attached to the case at all times[5]). (*Id.* at 92:8–11; 91:18–19; 107:3–8.) Rather, and nowhere referenced in the FDA-approved specifications or in any other identified source, Mr. Clemens developed his own "feel" test where he subjectively "felt" how much force it took to install the P-cap. (*Id.* at 105:2–19.)

Courts consider four factors in assessing the reliability of an individual expert's methodology under Rule 702, and Mr. Clemens's "feel" test meets none of

---

[5] Hearing Tr. at 67:3–5 ("Q. When you received the pump, was the retainer ring affixed to the case? A. Yes, the retainer ring was affixed.")

them. The factors inquire whether: (1) "the expert's methodology has been tested or is capable of being tested"; (2) "the theory or technique used by the expert has been subjected to peer review and publication"; (3) "there is a known or potential error rate of the methodology"; and (4) "the technique has been generally accepted in the relevant scientific community." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014). A court may consider "whether the opinion was created for the purpose of litigation" as an additional factor. *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1102 (S.D. Fla. 2022).

Here, Mr. Clemens's personal "feel" test—developed exclusively for this litigation—cannot, by its personal nature, be validated or even tested by anyone but Mr. Clemens. Having eschewed the objective, scientifically validated torque test, it is of course impossible for this Court (or anyone else) to gauge what Mr. Clemens subjectively *felt* when installing the P-cap. To be sure, that is the reason engineers use a numerical torque test: it is a test that the community can repeat and objectively interpret. Mr. Clemens's personal "feel" test that was apparently developed for his particular hypothetical scenario has never been subjected to peer review or publication, and he cites no authority whatsoever recognizing this "methodology." Mr. Clemens also confirmed that he did not test any other pumps that would even enable him to compare results. (Hearing Tr. at 92:18–21.)

Mr. Clemens tried to buttress his unscientific test by representing to the Court that he was able to repeat his test and "sense that feeling" that the P-cap was fully loaded "pretty much in the same location" throughout his testing. (Hearing Tr. at 105:20–106:02.) But Rule 702 does not ask whether an expert can repeat an unreliable methodology while at the same time ignoring an objectively reliable one; it demands that an expert's methodology be accepted and capable of validation. *See, e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result."). And, as noted above, this is to say nothing about the inherent contradiction that Mr. Clemens's "feel" test suggested that there was excessive force to install the P-cap while at the same time suggesting that "it doesn't take a whole lot of, you know, motion on that connector to fully load it." (Hearing Tr. at 106:16–107:2.)

Courts consistently exclude expert conjecture like Mr. Clemens's that is not published, not scientifically accepted, and incapable of outside validation. In the *Zantac* litigation, for example, the court excluded an expert's testing because, *inter alia*, the testing protocol and methodology were never "tested (much less validated)" by "the FDA, any other regulatory body, or even any independent scientist" and was not "peer reviewed or published." 644 F. Supp. 3d at 1121. Another Florida district

court similarly excluded an expert's opinion about the cause of a fire where the opinion was based on a self-conducted burn test that involved the expert applying a propane torch to various components of an air conditioning unit to see whether they would catch on fire. *Barnext Offshore, Ltd. v. Ferretti Group USA, Inc.*, No. 10-23869-CIV, 2012 WL 13012778, at *10 (S.D. Fla. May 24, 2012).

The same is true here: Mr. Clemens rejected objective, validated tests that are available (and indeed the objective results of those tests), in favor of a personal, subjective, "feel" test that is not validated, not able to be tested, and was made up for this particular litigation. Very simply, Mr. Clemens's "feel" test fails the reliability prong of *Daubert* and Rule 702.

### C.    Mr. Clemens's opinions do not fit the facts of this case.

In addition to its speculative nature and inherent unreliability, Mr. Clemens's testimony should be excluded because it does not fit the facts or claims in this case. Even if Mr. Clemens hypothetical scenario was somehow admissible, "[a]n expert's testimony must be helpful to meet the third *Daubert* requirement" and "to be helpful, expert testimony must fit the facts of the case." *Zantac*, 644 F. Supp. 3d at 1103 (citing *McDowell*, 392 F.3d at 1298–99). For Mr. Clemens's opinion to be helpful, "it must 'logically advance a material aspect of the case'…" *Id.* But Mr. Clemens's hypothetical scenario allegedly experienced by Mr. Gautney is not helpful because it does not fit Plaintiff's only theory of liability: manufacturing defect.

Mr. Clemens does not dispute that Mr. Gautney's pump met all specifications, or that the retainer ring had no cracks at the time it left Medtronic's control. (Hearing Tr. 78:17–23.) Mr. Clemens further admitted that Mr. Gautney's pump had no defects at the time it left Medtronic's control: "And it doesn't show up in manufacturing. It shows up over time and general use exposure to whatever cleaning chemicals and just general wear and tear. The damage to the weld area shows up over time. It's not something you see right away." (*Id.* at Tr. 99:3–7.) On that concession alone, Mr. Clemens does not "materially advance" any manufacturing defect theory under Florida law. *See* (Mot'n for Summ. J. Mem., ECF No. 64, at 29–32 (collecting cases finding a manufacturing defect must exist at the time the product left the manufacturer's control).)

And, until the April hearing, Mr. Clemens's testimony was that any user, with any pump, in any condition (including a brand-new pump), could under-rotate a P-cap and not properly insert a reservoir. *See* (Pltf. Ex. 45 at 177:19–178:1.) Not surprisingly, Mr. Clemens agreed that his under-rotation theory was of course possible with the re-designed series 600 pumps (that contained the new PC/ABS retainer ring), and was possible with a pump that was manufactured using different welding parameters. (*Id.* at 178:10–18.) It was not until the April hearing that Mr. Clemens modified his testimony and claimed that his under-rotation theory was only made possible by damage to the retainer ring. (Hearing Tr. at 92:12–17.)

Regardless of which testimony is to be credited, as set forth more fully below in Section II, Mr. Clemens cannot save his speculative opinions by now suggesting that his critique of the design of Mr. Gautney's 670G is actually a manufacturing defect that was recognized by Medtronic, the FDA, and Greenleaf. This 11th hour claim is belied by the arguments and documents detailed below.

Because Mr. Clemens's opinions do not support Plaintiff's only pleaded theory of recovery, they do not fit the facts of this case. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (to meet the "fit" requirement "the evidence must have a valid scientific connection to the disputed facts in the case."). As a result, his testimony should be excluded for this additional reason.

## II.     Plaintiff and Mr. Clemens Misrepresented Medtronic, FDA, and Greenleaf Documents

For the first time in the case and in an attempt to bolster his testimony at the hearing, Mr. Clemens represented to the Court that three independent sources confirmed that the cracked retainer ring was not due to the pump's FDA-approved design, but rather due to a manufacturing defect: 1) Medtronic's internal analysis, 2) FDA's findings, and 3) consultant Greenleaf Health's observations. According to Mr. Clemens, all three sources allegedly mirrored his opinion that a damaged retainer ring caused excessive resistance to fully install the P-cap, and the user would "feel" it was fully installed even though "he didn't get it fully loaded." *See* (Hearing Tr. 60:4–61:23; *see also id.* at 56:8–12 ("And there is a great amount of consistency

between my findings and opinions and the FDA and Greenleaf's opinions and even Medtronic's opinions. ***They are very consistent between all of us***." (emphasis added).) The Court directly asked Mr. Clemens whether his opinions—both his theory and his conclusion that the issue was based on "manufacturing problems"— was the same as Medtronic, FDA, and Greenleaf:

> THE COURT: And lastly, Mr. Clemens, the problems that were identified by the FDA and Greenleaf and I guess Medtronic as well, were they the same manufacturing problems that you believe exist in this device or was there something -- was there even a nuance difference or was it the same thing in your view[?]
>
> THE WITNESS: In my view it was all -- ***we were all observing the same things***.

(Hearing Tr. 108:1–7 (emphasis added).)

In a word: false. The Court need look no further than the exact documents that Plaintiff and Mr. Clemens cited to confirm as much.

### A. Mr. Clemens's resistance theory appears nowhere in Plaintiff's exhibits.

Contrary to Mr. Clemens's excessive resistance theory, Medtronic determined that there was potential risk in using a pump whose retainer ring was damaged to such an extent that the reservoir became ***loose*** or ***detached*** from the pump. Here, Mr. Gautney's retainer ring never became loose or detached, even in the years following his death. But Plaintiff and Mr. Clemens presented Medtronic's finding in an

incomplete and misleading way. Slide 26 of Mr. Clemens's PowerPoint slides presents the below screenshot, seemingly consistent with Mr. Clemens's theory:



Mr. Clemens's screenshot omits, however, the all-important context and heading for that observation:



(Pltf. Ex. 38 at 13.) When the documents are not conveniently excerpted into a PowerPoint slide, the documents make clear that the potential risk Medtronic identified is one where damage to the retainer ring causes the P-cap and reservoir to become *loose*. *See also* (Pltf. Ex. 16 at 2 ("There have been reported incidents of a *loose reservoir* that can no longer be locked into the pump. The reservoir can become loose due to a broken or missing retainer ring that prevents a proper lock.") (emphasis added).) Far from being "consistent with" the potential risk Medtronic identified—a ***broken*** or ***missing*** retainer ring that causes a *loose* reservoir that cannot lock into place—Mr. Clemens unequivocally admitted that is not what he observed in Mr. Gautney's pump: "obviously my opinion [] is that the damage to the retainer ring causes the P-cap not to be fully loaded, not that the retainer ring is loose or comes detached." (Hearing Tr. at 86:1–5); (*see also id.* at 85:1–8 ("Q. And you

agree that the reservoir was not loose when it was locked down in this position, don't you? A. I agree in the testing of the pump here, yes, that's correct, it was not loose.")

Similarly, Medtronic did not suggest that a damaged retainer ring was somehow related to a manufacturing defect. Rather, it noted the most obvious reason that the retainer ring could be broken – "as a result of dropping or bumping your pump on a hard surface." (Pltf. Ex. 16 at 2.) Despite this explanation being in the document that Mr. Gautney acknowledged that he read and understood, Mr. Clemens inexplicably testified there was not "any other potential cause for that [retainer ring] damage other than an improper weld that [he] could think of." (Hearing Tr. 104:15–105:1.) Once again, Mr. Clemens misrepresented the contents of the documents he claims where "we were all observing the same things." (*Id.* at 108:1–7.)

### B. Medtronic did not identify a manufacturing defect. Medtronic made a design improvement, a conclusion FDA and Greenleaf did not dispute.

Mr. Clemens's theory of manufacturing defect is not contained in any of the documents he cited either. In fact and contrary to Mr. Clemens's suggestion that "we were all observing the same things," each of Medtronic, FDA, and Greenleaf agreed that the change ultimately made to the 670G pump was one of design and that the "root cause" of the potential retainer ring issue was the plastic materials chosen for the pump case and the retainer ring. None of Medtronic, FDA or Greenleaf identified any shortcoming within the manufacturing process.

Medtronic's internal investigation and "root cause" analysis determined that the potential for damage to the retainer ring stemmed from the use of similar, but not the same plastic materials (stemming from different melt temperatures between the plastics). *See* Appendix A. The plastic materials used to build the 670G pumps are, of course, a quintessential part of the design of the pump, disclosed to the FDA, and ultimately approved by the FDA. *See* (Rep. to Am. Mot'n Summ. J., ECF No. 94, at 11–13.) Ultimately, Medtronic redesigned the series 600 pumps to address the identified potential damage to the retainer ring, something that Plaintiff and Mr. Clemens again conveniently cropped out of its PowerPoint presentation to the Court. In Slide 26, Mr. Clemens presented this screenshot (highlighting by Mr. Clemens):



Yet again, context matters. Even the *heading directly above* Mr. Clemens's list shows his slight of hand:



(Pltf. Ex. 13 at 1.) As is evident, Medtronic concluded that the *design* of the 600 Series pumps could be improved upon, and ultimately Medtronic did just that.

Moreover, despite Mr. Clemens's testimony that "we were all observing the same things," FDA never disputed Medtronic's root cause design conclusion. In fact, FDA repeatedly confirmed it. Although Mr. Clemens cited the FDA's Form 483 letter, Mr. Clemens failed to offer the Court its relevant language:



(Pltf. Ex. 11 at 1 (emphasis added).) What's more, FDA's publicly available website[6] related to the clear retainer ring recall confirms the "***FDA Determined Cause:***":



As for the third entity allegedly "observing the same things," Greenleaf Health did not disagree with Medtronic or FDA. Specifically, Greenleaf did not dispute Medtronic's CAPA conclusion that "manufacturing process anomalies and/or drifts

---

[6] *See* Class 1 Device Recall MiniMed 670G System With SmartGuard, *available at* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=178298.

in the manufacturing process *are not a likely contributor to the retainer ring failures*." (Pltf. Ex. 18 at 17 (emphasis added).) And, with respect to Greenleaf, Mr. Clemens's cited document (Clemens Slide 24) belies his testimony: Greenleaf's observations were related to *design* controls, not *manufacturing* processes:



(Pltf. Ex. 18 at 5.)

Very simply, Mr. Clemens was not "observing the same things" as Medtronic, FDA, or Greenleaf. None of the documents Plaintiff or Mr. Clemens cited identified any issue with retainer ring damage causing a user to "feel" like his P-cap was properly installed when it was not fully seated. Instead, Medtronic identified a potential risk for retainer rings becoming *loose* or *detached* due to the materials selected in the design of the pump. Medtronic then effectuated a design change to address that potential risk, and FDA and Greenleaf both confirmed the same.

\*   \*   \*

At the conclusion of the April hearing, Plaintiff's Counsel told the Court that "[a]ll you've heard today goes to the weight of their testimony, not the admissibility of their testimony." (Hearing Tr. at 248:3–4.) But in fact, Rule 702 was recently amended to address just that argument in just this setting. "[T]he 2023 amendment

was necessary because 'many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility' and that '[t]hese rulings are an incorrect application of Rules 702 and 104(a).'" *Ballew v. StandardAero Bus. Aviation Servs., LLC*, No. 2:21-CV-747, 2024 WL 245803, at \*3 (M.D. Fla. Jan. 23, 2024) (citing Advisory Committee Note to 2023 Amendment).

Here, as demonstrated above, Mr. Clemens fails to meet the requirements of Rule 702 because his speculative *ipse dixit* hypothetical is not based on sufficient facts; indeed, it is not based in facts at all. Mr. Clemens also fails the reliability prong of Rule 702 because his personal, subjective "feel" test is not accepted, validated, published or peer reviewed (in addition to being generated for this particular litigation). And as detailed above and in Appendix A, Mr. Clemens's representation to the Court that his theory is "consistent with" Medtronic's internal investigation, FDA's findings, or Greenleaf's observations was simply untrue.

Without support from the actual facts of this case or anywhere else, Plaintiff has failed to meet her burden to show that Mr. Clemens's hypothetical theory has a sufficient basis, reflects a reliable methodology, or is helpful to finder of fact. His opinions should be excluded.

## III. Drs. Goulden and Anderson Should Also Be Excluded

Dr. Goulden should be excluded for the reasons discussed in Medtronic's Motion to Exclude his testimony. (ECF No. 54.) In particular, and as he confirmed at the April hearing, despite his familiarity with the pump at issue (which he continues to prescribe), Dr. Goulden explicitly disclaims any opinion about the function of the pump. (Hearing Tr. at 148.) Without Mr. Clemens's theory on that issue, Dr. Goulden cannot "rule in" pump malfunction, and his opinion is unreliable.

Dr. Anderson should also be excluded for the reasons discussed in Medtronic's Motion to Exclude his testimony. (ECF No. 58.) Dr. Anderson's opinion is, essentially, that there is insufficient information to determine what caused Mr. Gautney's death to a reasonable degree of medical certainty. *Id.* His opinion, then, is simply that we do not and cannot know. In addition to such testimony flatly contradicting that of Plaintiff's other experts, his opinion would not be helpful to a jury and should be excluded in kind. *McDowell*, 392 F.3d at 1298–99 (to be admissible opinion testimony must be "relevant to the task at hand" and must "logically advance[] a material aspect of the case.").

## CONCLUSION

Medtronic respectfully requests that the Court grant its Motions to Exclude Mr. Charles Clemens, Dr. Peter Goulden, and Dr. William Anderson.

Dated: May 10, 2024

Respectfully submitted,

s/*Nicole Narotzky*
John K. Londot
Florida Bar No. 579521
GREENBERG TRAURIG LLP
101 E College Ave.
Tallahassee, FL 32301
londotj@gtlaw.com

Nicole E. Narotzky (admitted *pro hac vice*)
Thomas R. Pack (admitted *pro hac vice*)
Ann E. Motl (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
narotzkyn@gtlaw.com
packt@gtlaw.com
ann.motl@gtlaw.com

Rodney M. Hudson (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
101 Second Street, Suite #2200
San Francisco, CA 94105-3668
hudsonr@gtlaw.com

Allyson Julien (admitted *pro hac vice*)
Elizabeth Farrington (admitted *pro hac vice*)
GOLDMAN ISMAIL TOMASELLI BRENNAN &
 BAUM LLP
200 S. Wacker Dr., 22nd Floor
Chicago, IL 60606
ajulien@goldmanismail.com
bfarrington@goldmanismail.com

***Counsel for Defendant Medtronic
MiniMed, Inc.***

## WORD COUNT CERTIFICATION

In accordance with Northern District of Florida Local Rule 7.1(F), the undersigned certifies that the memorandum above contains 6,375 words.

s/*Nicole Narotzky*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


s/*John Londot*