**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

CARLA WIGGINS, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF CARLTON D. GAUTNEY, JR.,

                     Plaintiff,         Case No.: 3:22-cv-02781-MCR-ZCB

v.

MEDTRONIC MINIMED, INC.

                     Defendant.

_____/

**PLAINTIFF'S CLOSING ARGUMENTS IN RESPONSE TO**
**DEFENDANT'S *DAUBERT* MOTIONS TO EXCLUDE PLAINTIFF'S**
**EXPERTS REPORTS/OPINIONS (DOCS. 54, 58, 60)**

## I.      Introduction

In response to the Court's request, Plaintiff is providing her Closing Argument
in opposition to Defendant's Motions to Exclude the Opinions of Plaintiff's experts,
Charles Clemens, Peter Goulden, M.D. and William Anderson, M.D. Based on the
court's inquiries directly to Plaintiff's experts as well as the court's comments
throughout the hearing, Plaintiff believes the court has a firm grasp of the issues,
testimony and arguments, and Plaintiff does not wish to unnecessarily repeat or
rehash her previous arguments. Plaintiff therefore largely relies on its previous filed

written responses as well as the argument and testimony presented at the hearing held April 15, 2024.

At the conclusion of the testimony at the hearing, the Court appeared to have two primary concerns, neither of which had been raised by the Defendant prior to the hearing. First, is Plaintiff's (and her expert's) theory of defect really a design claim not raised by the pleadings? To be clear, Plaintiff's theory of defect is not a design claim, but solely concerns Medtronic's negligent manufacturing process which frequently resulted in a poor and improper weld between the retainer ring and case, leading to cracking and damage to the retainer ring.

The second issue raised at the hearing is whether the cracking present in the retainer ring of Mr. Gautney's pump was caused by the negligent ultrasonically welding process identified by Medtronic, Greenleaf, the FDA, and Mr. Clemens, such that Plaintiff's expert's theory "fits" the facts of the case.

Because these issues were first raised at the hearing, Plaintiff is supplying an affidavit from Mr. Clemens further clarifying and supporting his opinions and responding to the Court's concerns. (**Exhibit A**). In addition, the focus of the following Closing Argument is on addressing these two issues.

## II.   Charles E. Clemens

### A. Summary of Prior Opinions and Argument

As the court recognized at the time of the hearing, there is no dispute that Charles Clemens, Plaintiff's engineering and design expert, is properly qualified to testify regarding the opinions he has reached in this case.  In addition, there is no valid criticism of the extensive testing methodology he employed in analyzing the subject insulin pump in this case.

Mr. Clemens' opinions focus on two specific areas.  First, how Medtronic's insulin pump delivered an unrecorded bolus of insulin as Dr. Goulden determined occurred on the morning of May 17, 2020, leading to Mr. Gautney's death.  Second, whether that unrecorded delivery of insulin was related to the defective and negligent manufacture of the insulin pump by Medtronic.

Defendant suggests that Mr. Clemens improperly "relied" on the opinion of Plaintiff's expert endocrinologist, Dr. Peter Goulden, who determined that Mr. Gautney suffered from an unrecorded excess dose of insulin from his insulin pump on the morning of his death. This is simply not the case. Dr. Goulden's opinion stands on its own, and Mr. Clemens was simply tasked with determining how such an event could, and most likely did, happen. There is nothing improper about one expert determining the cause of an event that another expert determined scientifically to have occurred.

3

Based upon his inspection and testing of the pump, Mr. Clemens determined that the only reasonable explanation for this unrecorded over-delivery of insulin was that the condition of the pump caused Mr. Gautney to believe that the P-Cap was fully installed when he initially loaded the reservoir onto the pump. Based upon his examination and extensive testing, Mr. Clemens determined that the P-Cap on Mr. Gautney's pump felt fully loaded, as the instructions direct[1], even though it was not.

Thereafter, when Mr. Gautney discovered that the P-cap was not fully loaded on the morning of May 17, 2020, and proceeded to turn the P-cap to its fully loaded position, a bolus of 4-5 units or more would suddenly be delivered by the pump, without the user being aware of it. Mr. Clemens confirmed through repeated testing this mechanism for the delivery of an unintended bolus of insulin which would not be captured or recorded by the pump itself.

The reliability of Mr. Clemens' methodology in reaching this conclusion is indisputable. Mr. Clemens' extensive testing of Mr. Gautney's pump confirmed that the P-cap would "feel" fully loaded when it was not, and when later turned to its fully loaded position, the pump would deliver a large amount of insulin. In his testing, and review of the pump data, Mr. Clemens further confirmed that the delivery of this overdose of insulin was not reflected in the data recorded by the pump. Based upon the well-accepted methodology of ruling in and ruling out other

---

[1] See Hearing Exhibit 9A, MiniMed Getting Started Guide, page 77.

possible explanations for the occurrence of this event, Mr. Clemens determined that

there was no other plausible explanation and more likely than not, that is what

happened on the morning of May 17, 2020.

It is noteworthy that the Defendant has offered no alternative explanation for

the occurrence of such an event.  Defendant has not suggested any alternative cause

for this event, nor has it contested Mr. Clemens' conclusions regarding what happens

when the P-Cap is subsequently turned to its fully loaded position, nor the fact that

such an event is not captured or recorded by the pump.

B.  Clemens' Opinions on Negligent Manufacturing

A new argument raised by the Defendant at the time of the hearing relates to

the second aspect of Mr. Clemens' opinions in this case, that this event was directly

caused by the defective and negligent manufacture of the subject pump.  Defendant

suggests that Mr. Clemens' opinions regarding the malfunction of the insulin pump

are really "design" opinions, which were not raised by Plaintiff in her complaint and

would otherwise be preempted.  In other words, the Defendant now contends that

Mr. Clemens' opinions do not "fit" the allegations in the case because they are

criticisms of the design of the insulin pump, and not its manufacture.

Defendant points to its alleged solution to the problem, which was to choose

a different plastic for the retainer ring.  Since material selection is a design decision,

Defendant contends this proves the problem was design, not manufacturing.

However, Mr. Clemens has never criticized the initial selection by Medtronic of the polycarbonate (PC) material used in the clear retainer ring.  Mr. Clemens is well versed in this area of plastics and ultrasonic welding and has no criticisms of the "design decision" to use this material for the retainer ring.

As Mr. Clemens explains in his affidavit (Exhibit A), polycarbonate (PC) is a perfectly appropriate material to use for the retainer ring, as it is stronger than the PC/ABS plastic used for the case. (Clemens Affidavit, ¶ 6-7). Moreover, with proper manufacturing controls in place, there is nothing inherently incompatible between the two types of plastic that prevents them from reliably welding together. (*Id.*). However, proper manufacturing processes and controls must be in place during the ultrasonic welding process to ensure a proper weld between the two plastics, and therein lies the thrust of Mr. Clemens' criticism of Medtronic's manufacturing of this product.

Before submitting its original PMA to the FDA, Medtronic ***never validated*** its ultrasonic welding process (Clemens Affidavit, ¶ 9). Despite repeated requests, Medtronic has produced no records documenting the validation of the ultrasonic welding process prior to the PMA submittal. Medtronic thus never went through the process of determining the appropriate controls and parameters necessary to assure that there would be a proper weld between the PC retainer ring and the PC/ABS

case. This is itself negligence in manufacture and a violation of Medtronic's duties as a medical device manufacturer.

Had Medtronic properly validated the ultrasonic welding process, it could very easily have accomplished the proper ultrasonic welding between the two materials that would have prevented the clear retainer rings from cracking. (Clemens Affidavit, ¶ 6-9). It is noteworthy that Medtronic has produced no expert in this case to explain, justify or support its ultrasonic welding controls and processes. Similarly, Medtronic has not produced a single witness to testify that the two materials it chose were inherently incompatible, why the two materials were incapable of being properly welded with proper controls in place nor why this was not discovered prior to submitting its PMA to the FDA for approval.

The entire material selection issue is a smoke screen. As it did with the FDA, Medtronic is seeking to conceal the fact that its original manufacturing process was never validated which resulted in it being completely inadequate and deficient. This then led to the manufacture of thousands of "adulterated" and non-conforming pumps being sold to unsuspecting consumers like Mr. Gautney. Since Medtronic was required to (and represented to the FDA that it did) validate its manufacturing process at the time of its PMA, it has used the excuse of purported material incompatibility and a material selection "design change" to cover up these failures.

7

Despite Medtronic's efforts, the FDA ultimately determined that Medtronic's actions resulted in pumps "…that are adulterated within the meaning of section 501(h) of the Act [21 U.S.C. §351(h)] in that the *methods or controls* used for the manufacture, packing, storage or installation are not in conformity with the current *good manufacturing practice requirements* of the Quality System regulation found at Title 21, Code of Federal Regulations, Part 820." (emph. added). (Hrg. Ex. 12, FDA Warning Letter, December 9, 2021).

C. Medtronic's Bad Welding Process Caused the Cracking

To answer the court's concern that we are talking "apples to apples" here, there is no question that the cracking in Mr. Gautney's retainer ring is exactly the type of cracking that is caused by the improper welding of the retainer ring to the pump case. Again, Mr. Clemens' testimony on this is unrebutted by any Medtronic witness.

As Mr. Clemens further delineates in his affidavit (Ex. A), such cracking occurs not because of external trauma to the ring, but rather due to the stresses induced in the plastic during the poorly controlled welding process. (Clemens Affidavit, ¶ 8). Because the welding is incomplete and inadequate, stresses are created in the plastic which later results in cracking and breakage over time. (*Id.*). The type of stress cracking seen in Mr. Gautney's retainer ring is exactly the type of

cracking that occurs due to stress, as confirmed by Mr. Clemens during his visual and microscopic inspection. (Clemens Affidavit, ¶ 11-12).

Medtronic has offered no evidence, no witness and no expert to suggest that Mr. Clemens' opinions on the cause of the cracking are incorrect.  In fact, Medtronic itself determined the bad welding process was the cause of the cracked, broken and damaged retainer rings *without ever examining the welding surface between the damaged clear retainer rings and case.* In its root cause meeting on August 17, 2016, five (5) Medtronic employees got together and created a "fishbone" diagram of potential causes and *voted* that a weak weld joint was the most likely cause of the cracking and damage being reported regarding the retainer ring. (Hrg. Ex. 5, MDT_Gauc0000222).  They apparently never looked at a single case and examined the welding surface to make that determination.  This is entirely consistent with Mr. Clemens's observation that the obvious cause of the cracking seen in the retainer ring in Mr. Gautney's pump is the improper welding process.

Much later, Medtronic confirmed that the bad weld was the cause of the cracking in the retainer ring.  In its "PC/ABS Retainer UW Characterization Report" released in March of 2019, Medtronic describes the background of the problem as follows:

> Although each material exhibited melting there was little evidence of fusion or coalescence of the materials in the weld area.  In addition, the shear area of the Case Retainer by-passes the shear area of the Case Assembly either during

the ultrasonic component seating process or ***stresses from the joint design during the weld***.

(Hrg. Ex. 6, MDT_Gauc0111699).

That same document reported the "out of round" condition:

The PC Case Retainer exhibited an out-of-round condition after welding as well.  This out-of-round condition is ***partially due to stresses from the shear joint during welding*** and the PC not fully melting resulting in the two shear areas by-passing each other.  In addition, the cut-outs of the Case Retainer which engage with the P-Cap ***act as a hinge area***.

Medtronic's hired independent consultant, Greenleaf, confirmed that Medtronic's validation process was to blame.  Greenleaf confirmed that "the clear retainer ring failure mode was associated with an ***insufficient ultrasonic weld specification*** between the ring and the case. (Hrg. Ex. 18, Greenleaf Report, at MDT_Gauc0127372) and that   "*Design input requirements and associated verification testing were incomplete* with respect to material selection of the pump case and the use conditions that could be reasonably expected given its intended use." (*Id.* at MDT_Gauc0127366).  Simply put, if Medtronic had a validated process, it would not have an insufficient weld specification. In other words, a validated process does not produce an insufficient weld specification.

As Mr. Clemens discovered during his inspection of Mr. Gautney's pump, the retainer ring contained the exact same type of cracking that Medtronic reported in its own investigation.  (Clemens Affidavit, ¶ 11-12). Mr. Clemens also confirmed that Mr. Gautney's retainer ring was "out of round", exactly as Medtronic discovered

10

in many of those same units. (Clemens Affidavit, ¶ 11-12). This "out of round" condition is evidence of stress induced into the retainer ring during the ultrasonic welding process and a cause of additional stress to the retainer ring post-production. (*Id.*).

The damage described and depicted by Medtronic to the retainer ring is not something that occurs when the two components are properly welded together. (Clemens Affidavit, ¶ 6-8, 11-12). If it was simply a matter of the two materials not bonding, the retainer ring would not crack and ultimately break apart; it would simply fall out, completely intact. (*Id.* at ¶ 13).

The Defendant argues (without any evidence) that the breaking and cracking on the retainer ring observed in Mr. Gautney's pump could have occurred due to some other cause than improper welding. Yet, it has produced no expert to testify as to some other cause of the cracking and Mr. Clemens' testimony on this is unrebutted. There is no need to pull the two pieces apart and examine the weld between the retainer ring and case on Mr. Gautney's pump because the type of cracking seen is exactly the same as is seen resulting from induced stress. (Clemens Affidavit, ¶8, 11-13). And, as noted above, Medtronic (and its consultant, Greenleaf) identified the stress and improper welding as the source of the cracking and breaking of the clear plastic retainer rings without ever examining the welding surface. (Hrg. Ex. 18, Greenleaf Report, at MDT_Gauc0127372).

11

Defendant makes much of the fact that Mr. Clemens testified that it was "possible" this failure mode could occur even in a non-defective pump.  Again, the Defense wants to talk about "possibilities" in a world where anything is possible. Such an argument conveniently overlooks Mr. Clemens' testimony that such an event would be "very unlikely." (Hrg. Ex. 46, Clemens 3/9/23 Deposition, 125:15-126:10).

Medtronic's argument also ignores the results of Mr. Clemens' testing, which established that, from the subjective perception of the user, cracking, and breakage of the retainer ring, as well as its out-of-round condition, results in a user "feeling" as if the P cap is completely secured or locked into place.  This is not something that occurs in a non-defective pump with a properly manufactured retainer ring.  In other words, with a retainer ring that has no cracking, and which is not "out of round" there is no change in the tactile user experience.  Is it "possible" for a user to intentionally or unintentionally not fully lock the P-cap? Yes. However, in the absence of a cracked and deformed retainer ring, it is "very unlikely" and has never been reported.

Medtronic repeatedly suggests that for this event to have happened, Mr. Gautney must have failed to follow the directions provided in the 389 page "System User Guide."  This ignores the explicit instructions in the "Getting Started" guide provided to Mr. Gautney, in which he was instructed to turn the P-cap "clockwise

until you feel it lock into place." (Hrg. Exhibit 9 & 9A, MiniMed Getting Started Guide, pg. 77).

Medtronic also ignores the fact that it understood and appreciated that users were being injured and harmed because of this defect despite technical non-compliance with the instructions provided.   For example, Medtronic itself recognized that damaged retainer rings could fall out and potentially cause severe hypoglycemia or hyperglycemia when a user reconnected the reservoir back into the case while the infusion set was still connected to their body, contrary to instructions. (*See* Hrg. Ex. 38, at MDT_Gauc0602; and MDT_Gauc0001212).   Medtronic's negligence is not excused by a user's failure to read and follow the user manual, especially where Medtronic understood users do not read the instructions every time they interact with the device, nor do they follow the strict dictates of the user manual in everyday use.

As Medtronic itself recognized, where there is reservoir retainer ring damage, there is potential for not only inconvenience, but both under and over delivery of insulin which could potentially lead to severe health consequences and death:

| 4.3 | Adverse Health Consequences |
|---|---|
| In case of reservoir retainer ring damage, there is a potential for:<br>• Inconvenience to the patient<br>• Under delivery of insulin leading to hyperglycemia, severe hyperglycemia, or diabetic ketoacidosis<br>• Over delivery of insulin leading to mild or severe hypoglycemia or death | |

(Hrg. Ex. 39, FPIA, at MDT_Gauc001203).

In one example, Medtronic received a report very similar to that involving Mr. Gautney.  Medtronic received the following report in April of 2017 of an episode of severe hypoglycemia suffered by a user while wearing the insulin pump.  Medtronic received the unit, noted that it had a "cracked retainer ring", but "concluded" (as it does in the instant case) it did not impact the functional performance of the pump:

| Complaint number | Severity | Country | Notified Date | Model | Event summary | Investigation Summary |
|---|---|---|---|---|---|---|
| 307436680 | Major - Hypo | COLOMBIA | 24-Apr-17 | MMT-1712 (640G) | It was reported via phone call on April 24, 2017 that the patient had medical intervention due to low blood glucose of 31mg/dl and 28mg/dl. Blood glucose level at the time of call was 226 mg/dl. Emergency medical services were dispatched on April 16, 2017 and April 19, 2017. Customer treated by glucagon shot. The customer was wearing the insulin pump during the incident. Insulin pump had crack on the reservoir compartment. | The pump was received for analysis and passed functional testing. The pump was received with a cracked retainer ring, however this did not impact functional performance of the pump. |

(MDT_Gauc0002310, 1/16/20 Medtronic communication to FDA).

Mr. Clemens' opinions therefore "fit" the facts of this case.  The retainer ring on Mr. Gautney's pump was cracked and damaged as a result of the negligent ultrasonic welding process.  This determination by Mr. Clemens is supported by his visual examination of the nature of the cracking and damage, as well as Medtronic's own investigation into the cause of pervasive cracking and damage to retainer rings in numerous other pumps.   Based upon his further testing, Mr. Clemens determined that this damage misled Mr. Gautney into feeling the P-Cap was fully in place, and when the P-Cap was later turned to its fully locked position, the pump delivered an unintended, unrecorded, bolus of insulin.

### III.   Dr. Peter Goulden

As an expert endocrinologist, Dr. Peter Goulden is eminently qualified to render opinions that Mr. Gautney received an unrecorded bolus of insulin which caused severe hypoglycemia and led to his death.  Dr. Goulden's opinions are supported by the evidence and are the reliable product of a scientifically reasoned differential diagnosis.  The defense criticisms of the number of medical records he reviewed are proper matters for cross-examination, not exclusion.

There is no dispute that Dr. Goulden is qualified to testify about diabetes, the effect of insulin on a patient's blood sugar levels, and the effects of severe hypoglycemia. There is also no dispute that he can rely on the opinions of Plaintiff's

engineering expert, Charles Clemens, regarding how the pump malfunctioned and delivered an unrecorded bolus of insulin to Mr. Gautney. (Hearing Tr. 265:13-14).

Defendant nonetheless contends that Dr. Goulden did not "reliably rule out death itself as the cause of Mr. Gautney's hypoglycemia." (Tr. 265:10-12). This is simply untrue.

Using the "anything is possible" method of cross-examination, Defendant argues that statements from Plaintiff's experts that it is "possible" Mr. Gautney died any time after 7:31 a.m. on May 17, 2020 (Tr. 120:8-11), means that it is "possible" he died before he was severely hypoglycemic. Nothing in medicine or science is absolute, and the Defendant simply ignores the substantive testimony of Dr. Goulden (as well as Dr. Armstrong and Dr. Anderson) that more likely than not, Mr. Gautney died from a severe episode of hypoglycemia. (Tr. 119:18-23).

The Defense notes that Mr. Gautney was not hypoglycemic at 7:36 a.m. In fact, his sensor sugar levels rose until 7:50 am and began to fall again thereafter. Defense therefor contends that if he died before 7:50 a.m., his death must have been due to some other cause than hypoglycemia. However, Defendant contradicts its own position in this case. Given Defendant's agreement that glucose levels fall after death (no matter the cause), it is very unlikely Mr. Gautney died before 7:50 a.m.

As Dr. Goulden opines, the rapid and dramatic fall in glucose levels after 7:50 a.m. can only be due to one thing: an excess amount of insulin not recorded by his

insulin pump.  This then directly led to his death sometime after the sensor glucose levels dropped below 40, the low limit of the sensor, at 8:15 a.m. (Tr. 123:21-24; 125:10-16).

While the Defendant contends that such a drop in glucose levels could be due to death, there is ample scientific evidence to the contrary.  As Dr. Anderson stated in his testimony, studies show that the rate of drop in *blood* glucose levels after death is about 10 minutes to drop 1-2 milligrams, and an hour to drop 12-20 milligrams. (Tr. 202:4-11).  In Mr. Gautney's case, we see *interstitial* glucose levels (which are less affected by death) drop by over 46 milligrams (from 86 to 40, the low limit of the sensor) in 41 minutes!  As Dr. Anderson noted, the amount of decline seen in Mr. Gautney's levels "would probably take a number of hours" if it was due to postmortem changes. (Tr. 203:12-14).

Certainly, then, Dr. Goulden reliably ruled in excess insulin and ruled out death as the cause of the drop in Mr. Gautney's sensor glucose levels.

The only other critique of Dr. Goulden is that in opining that Mr. Gautney died from severe hypoglycemia, he didn't properly rule out other potential causes of Mr. Gautney's death.  Dr. Goulden used the "differential diagnosis" method in arriving at his opinion, and the reliability of that method is not in question.  The Defense simply suggests that reviewing "19 pages of medical records" is insufficient to do so.  This is simply "lawyer argument", as the contention that there is a certain

quantum of medical records that is necessary is unsupported by any scientific

literature or testimony.   Moreover, Dr. Goulden later reviewed the additional

medical records obtained after his initial report and confirmed his initial differential

diagnosis as to the cause of Mr. Gautney's death.   Dr. Goulden's opinion is also

supported by Plaintiff's expert cardiologist, Dr. Armstrong, whose opinions have not

been attacked as unreliable.

The Defense cites to nothing new or additional in any of the medical records

that would render Dr. Goulden's initial opinions wrong or unreliable.   Nor has the

Defendant identified any other more likely cause of death – the best its experts can

do is suggest a myriad of speculative possibilities with zero evidentiary support.

## IV.   Dr. William Anderson

As the Court recognized at the time of the hearing, Plaintiff's designated

forensic pathologist, William R. Anderson, M.D., is a proper rebuttal witness.  (Tr.

247:5-9).  Defendant has not attacked any of the rebuttal opinions in Dr. Anderson's

report and has made no showing that any of his rebuttal opinions should be excluded.

A rebuttal expert can properly attack the opposing experts' opinions without

needing to offer substantive opinions of his own. In forming his rebuttal opinions,

Dr. Anderson did not—nor did he need to—arrive at his own conclusions about the

cause of death.  He is critiquing the opinions reached by the medical examiner and

Defendant's other experts' opinions as incorrect, unreliable, and not based on scientific data.

As this court has itself recognized: "[a] rebuttal expert, by definition, criticizes or rebuts the methodology and opinions of another expert…his opinions properly may be limited to criticizing the analysis and conclusions presented another party." *Navelski v. Int'l Paper Co.,* 244 F. Supp. 3d, 1275, 1302 (N.D. Fla. 2017) (citations omitted); *see also Wreal, LLC v. Amazon.com, Inc.,* No. 14-21385, 2016 WL 8793317, at *4 (S.D. Fla. Jan. 7, 2016) (noting that "several district courts…have concluded that rebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives" and collecting cases).

## LOCAL RULE 7.1 (F) CERTIFICATION

In compliance with Local Rule 7.1 (F), Plaintiff's Counsel certifies that the foregoing memorandum contains 4,017 words.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 10, 2024, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will serve

an electronic copy on all counsel of record.

> /s/ *J. Scott Murphy*
> **J. SCOTT MURPHY, ESQ.**
> FBN: 0373001
> **ANDREW F. KNOPF, ESQ.**
> FBN: 658871
> **PAUL | KNOPF | BIGGER**
> 1560 North Orange Ave., Suite 300
> Winter Park, Florida 32789
> Ph: (407) 622-2111; F: (407) 622-2112
> scott@pkblawfirm.com
> andrew@pkblawfirm.com
> abla@pkblawfirm.com
> *Attorneys for Plaintiff*